AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America<br>v.<br><br>CARL BRADLEY JOHANSSON,<br>  aka "Brad Johansson,"<br>  aka "Brad Johnson,"<br>  aka "Carl Johnson,"<br>  aka "C. Brad Johanson," and<br>ENRIQUE GARCIA,<br>  aka "Henry Garcia,"<br>        Defendant(s) | ED MJ 18 - 0110<br><br>Case No.<br><br>FILED<br>CLERK, U.S. DISTRICT COURT<br>APR – 5 2018<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY      DEPUTY |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of May 6, 2014, in the county of Riverside in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 49 U.S.C. § 5124(a), 49 C.F.R. § 180.413(a)(1); 18 U.S.C. § 2(b) | Criminal violation of welding without required certifications; Causing an act to be done. |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet

|5|

*Complainant's signature*

RASMUS JAMES, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.
Date:
      APR   5   2018

City and state:  Los Angeles, California

*Judge's signature*

Hon. SUZANNE H. SEGAL,
U.S. Magistrate Judge
*Printed name and title*

ATTACHMENT TO COMPLAINT

Offense Description:

On or about May 6, 2014, in Riverside County, within the Central District of California, defendant CARL BRADLEY JOHANSSON, also known as ("aka") "Brad Johansson," aka "Brad Johnson," aka "Carl Johnson," aka "C. Brad Johanson" ("JOHANSSON"), and defendant ENRIQUE GARCIA, aka "Henry Garcia" ("GARCIA"), did willfully and recklessly violate, and willfully cause the violation of, a regulation promulgated pursuant to the Hazardous Materials Transportation Safety Act, Title 49, United States Code, Section 5101 *et seq.*, namely Title 49, Code of Federal Regulations, Section 180.413, which prohibited the repair or modification of a specification cargo tank at a repair facility that did not hold a valid National Board Certificate of Authorization authorizing the use of a National Board "R" Stamp and was not registered with the United States Department of Transportation.  Specifically, defendants JOHANSSON and GARCIA caused two welders to make repairs on a MC 306 cargo tank, number 678238, at National Distribution Services, Inc.'s facility at 340/344 North Grant Avenue in Corona, California, without a valid National Board "R" Stamp.

**Contents**

I.      PURPOSE OF AFFIDAVIT.................................................................................1

II.     BACKGROUND OF SPECIAL AGENT RASMUS JAMES ...............................2

III.    SUMMARY OF PROBABLE CAUSE...................................................................2

IV.     APPLICABLE LAW ............................................................................................5

        A.      Welding Without Required Certifications ....................................................5

        B.      Reincarnated Carriers.................................................................................7

V.      STATEMENT OF PROBABLE CAUSE...............................................................8

        A.      The Explosions.........................................................................................8

                1.      The Fatal 1993 Explosion ................................................................8

                2.      The 2012 Explosion at the PROPERTY..........................................10

                3.      The Fatal 2014 Explosion at the PROPERTY ...............................11

                4.      JOHANSSON's Sworn Statement Denying That He Discussed the
                        Repair of the Tanker with GARCIA Prior to the May 2014
                        Explosion .......................................................................................14

                5.      Video Footage of the May 2014 Explosion ....................................15

                6.      JOHANSSON's Additional Efforts to Obstruct the Investigation
                        into the May 2014 Explosion..........................................................16

                7.      Control of the Tanker That Exploded in May 2014.......................17

        B.      NATIONAL's Lack of "R" Stamp Certification and JOHANSSON's
                Knowledge of "R" Stamp Violations.........................................................20

                1.      NATIONAL's Lack of "R" Stamp Certification ............................20

                2.      JOHANSSON's Knowledge of Welding Certifications and
                        Welding Activity at NATIONAL ...................................................21

        C.      The August 2014 Emergency Order .........................................................23

        D.      Violations of the Emergency Order by NATIONAL and WHOLESALE 25

                1.      Violations of the Emergency Order by NATIONAL in Late
                        2014................................................................................................25

                2.      Violations of the Emergency Order Identified During
                        Surveillance...................................................................................28

3.     Additional Violations of the Emergency Order Identified in the
       California Highway Patrol's Inspection Reports ..........................30

E.     JOHANSSON's Control of NATIONAL ....................................................32

       1.     NATIONAL's Corporate Structure ................................................32

       2.     The Relationship Between JOHANSSON and Scott, Jr. ...............33

       3.     JOHANSSON's Attempt After the Explosion to Cast Himself As a
              Temp for Kimco Staffing ................................................34

       4.     Employees' Confirmation that JOHANSSON Controlled
              NATIONAL ................................................................................36

       5.     JOHANSSON's Control and Personal Use of NATIONAL's Bank
              Accounts ......................................................................................39

       6.     Additional Bank Accounts Evidencing JOHANSSON's Control of
              NATIONAL ................................................................................42

       7.     JOHANSSON's Use of NATIONAL's Expense Cards ................44

F.     TankServices LLC and NATIONAL's Lack of Employee Tax Payments45

G.     NATIONAL's Claim That It Left the PROPERTY ....................................48

H.     JOHANSSON's Control of WHOLESALE .................................................49

       1.     WHOLESALE's Corporate Structure .............................................49

       2.     The Tanker Fire ...............................................................................50

       3.     Inspections and Surveillance in 2017 and 2018.............................51

       4.     Banking Records Showing JOHANSSON's Control of
              WHOLESALE ..............................................................................53

       5.     Richgel's Milk Service .......................................................54

I.     SPICER's Sworn Statement in October 2016 That WHOLESALE Was
       Not a Reincarnation of NATIONAL .........................................................55

VI.    TRAINING AND EXPERIENCE RE TRUCKING COMPANIES ....................57

VII.   TRAINING AND EXPERIENCE RE TAX CRIMES .........................................59

VIII.  TRAINING AND EXPERIENCE RE DIGITAL DEVICES ...............................60

IX.    CONCLUSION........................................................................................65

2

## AFFIDAVIT

I, Rasmus James, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.      This affidavit is made in support of criminal complaints against and arrest warrants for Carl Bradley Johansson, also known as ("aka") "Brad Johansson," aka "Brad Johnson," aka "Carl Johnson," aka "C. Brad Johanson" ("JOHANSSON"), and ENRIQUE GARCIA, aka "Henry Garcia" ("GARCIA"), for a violation of 49 U.S.C. § 5124, 49 C.F.R. § 180.413(a)(1), and 18 U.S.C. § 2(b) (criminal violation of welding without required certifications; causing an act to be done), and for Donald Cameron Spicer ("SPICER") for a violation of 18 U.S.C. § 1001 (false statements).

2.      This affidavit is also made in support of an application for a search warrant commanding any agent of the United States Department of Transportation, Office of Inspector General ("USDOT-OIG") and Internal Revenue Service ("IRS"), with any reasonable investigative and technical assistance they may seek from other law enforcement agencies to execute the search warrant, and any assistance they may seek from expert witnesses to help identify items to be seized, to search 340/344 North Grant Avenue, Corona, CA 92882 (the "PROPERTY"), which is more fully described in Attachment A, for evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 371 (conspiracy to violate 49 U.S.C. § 5124 and 49 C.F.R. § 180.413(a)(1) and conspiracy to defraud the United States); 18 U.S.C. § 1001 (false statements); 49 U.S.C. § 5124(a) and 49 C.F.R. § 180.413(a)(1) (criminal violation of welding without required certifications); 26 U.S.C. § 7201 (tax evasion); and 26 U.S.C. § 7202 (willful failure to collect or pay over tax) (collectively, the "SUBJECT OFFENSES"), as described in more detail in Attachment B, by JOHANSSON, GARCIA, SPICER, National Distribution Services, Inc. ("NATIONAL"), and Wholesale Distribution, Inc. DBA Quality Services ("WHOLESALE").  Attachments A and B are incorporated herein by reference.

1

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show that there is sufficient probable cause for the requested complaints and warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   BACKGROUND OF SPECIAL AGENT RASMUS JAMES

4.     I am a Special Agent ("SA") with USDOT-OIG, and am assigned to the Cerritos office of USDOT-OIG.  I have been employed as a SA for USDOT-OIG since 2011.  During my employment with USDOT-OIG, I have conducted and participated in numerous investigations pertaining to violations of federal transportation laws.  Prior to becoming a SA for USDOT-OIG, I served in the United States Air Force as a SA for the Air Force Office of Special Investigations for approximately eight years.  As a USDOT-OIG SA, I have received training in the investigations of criminal violations of Title 18 and Title 49 of the United States Code that are relevant to the USDOT's Federal Motor Carrier Safety Administration ("FMCSA").  FMCSA's responsibilities include monitoring and enforcing compliance with regulations governing the safety and commerce related to interstate motor carriers.

## III.   SUMMARY OF PROBABLE CAUSE

5.     NATIONAL was a hazardous-materials transportation company whose principal place of business was the PROPERTY.  On or about May 6, 2014, two welders employed by NATIONAL were repairing a DOT-specification cargo tanker at the PROPERTY when the tanker exploded.  The explosion dismembered and killed one welder, Samuel Enciso ("Enciso"), and seriously injured the other welder, Daniel Lopez Velasquez ("Velasquez").

6.     Because NATIONAL was a motor carrier operating DOT-specification cargo tanks, it was required to have repairs to its DOT-specification cargo tanks performed by a manufacturer or cargo-tank repair facility holding a National Board Certificate of Authorization

2

"R" Stamp or a valid American Society of Mechanical Engineers ("ASME") "U" Stamp. NATIONAL was not a cargo tank shop or repair facility registered with the DOT, was not authorized to conduct repairs to DOT-specification cargo tanks, and did not have an "R" Stamp or a "U" Stamp.

7.      JOHANSSON controlled and managed NATIONAL.  He supervised GARCIA, who was NATIONAL's Shop Manager.  GARCIA, along with Juan Solis (NATIONAL's Assistant Shop Manager), supervised Enciso and Velasquez.  According to Solis, GARCIA instructed Enciso and Velasquez to conduct the welding repairs that caused the explosion.

8.      JOHANSSON knew about the "R" Stamp requirement.  On or about March 5, 1999, JOHANSSON had pled guilty in *United States v. Johansson*, C.D. Cal. Case No. 98-CR-674-RAP, for, *inter alia*, causing a welder at JOHANSSON's company to make repairs on a cargo tank when the company lacked an "R" Stamp.  The welder, Leonardo Quintero, was killed while working inside a cargo tanker when his welding torch ignited fumes.

9.      FMCSA's investigation into the May 2014 explosion resulted in FMCSA's issuance of an Out-of-Service Order (the "Emergency Order") on or about August 14, 2014.  The Emergency Order prohibited NATIONAL from, *inter alia*, operating 42 specified tankers to transport gasoline and ethanol prior to obtaining authorization from FMSCA.  The 42 tankers had been identified by FMCSA as posing safety dangers and/or lacking safety documentation.

10.     Rather than comply with the Emergency Order, NATIONAL brought an unsuccessful legal challenge to the Emergency Order and almost immediately began ignoring the Emergency Order by operating some of the prohibited tankers.  To evade the Emergency Order, NATIONAL ceased operations and became WHOLESALE in early 2015.  WHOLESALE had most of the same management as NATIONAL and many of the same employees, and operated many of the same tankers.  WHOLESALE was a "reincarnated carrier" created to enable NATIONAL and its management to skirt the Emergency Order.

3

11.     To evade the Emergency Order, safety regulations, and the Internal Revenue Code, JOHANSSON created a series of shell entities to hide his own extensive personal involvement in NATIONAL and WHOLESALE.  Part of JOHANSSON's scheme involved telling investigators after the May 6, 2014 explosion that he did not control NATIONAL because he was merely a "paper pusher" who, at the time of the explosion, purportedly worked for a temporary staffing company that had assigned him to be an "administrative manager" at NATIONAL.  In fact, an annual Officer Form, dated May 30, 2014, listed JOHANSSON as the President, Secretary, Treasurer, and Director of NATIONAL.  Documents showed that JOHANSSON did not come up with the idea to cast himself as an unwitting "temp" until after the explosion.

12.     Another part of JOHANSSON's scheme to avoid regulatory oversight was to shift NATIONAL's shop employees (including Enciso and Velasquez, who carried out the dangerous and unauthorized welding on the tankers) to the books of a company called TankServices LLC ("TankServices").  JOHANSSON arranged for TankServices to issue paychecks to NATIONAL's shop employees; TankServices then invoiced NATIONAL for reimbursement.  Under this scheme, as confirmed by several NATIONAL employees, neither NATIONAL nor TankServices paid any employment taxes for NATIONAL's shop employees, likely in contravention of federal law.

13.     JOHANSSON also used his shell companies to avoid paying income taxes.  He has filed no personal tax returns since 2008, and NATIONAL did not file tax returns for 2013 or 2014, despite bank records showing that NATIONAL had more than $22 million in deposits during that period.  Whereas JOHANSSON claimed that he had never been compensated by NATIONAL, JOHANSSON paid for personal expenses, including his four children's private school tuitions, directly from NATIONAL's bank accounts.

14.     SPICER was the safety manager at NATIONAL, and has held a comparable position at WHOLESALE for several years.  In a May 2014 interview with investigators, SPICER said that JOHANSSON controlled the operations of NATIONAL.

15.     On or about October 17, 2016, SPICER signed WHOLESALE's FMCSA Form MCSA-1, in which WHOLESALE registered with FMCSA.  Under penalty of perjury, in response to the question of whether WHOLESALE was a reincarnated carrier ("Do you currently have, or have you had within the last 3 years of the date of filing this application, relationships involving common stock, common ownership, common management, common control or familial relationships with any FMCSA-regulated entities?"), SPICER replied "No."

16.     In fact, JOHANSSON (SPICER's boss at both NATIONAL and WHOLESALE) continued to control WHOLESALE, as JOHANSSON occasionally admitted.  For example, on or about December 1, 2015, when one of WHOLESALE's tankers caught fire on the I-15 freeway, a person named "Carl Johnson" responded to the accident and said that he was the owner of WHOLESALE.  The same man signed a form at the accident scene under the name "Brad Johansson" on behalf of WHOLESALE.  On or about October 14, 2016, JOHANSSON admitted to a bank examiner that he owned WHOLESALE.

17.     Since 2015, millions of dollars have been transferred from WHOLESALE's bank accounts to other accounts controlled solely by JOHANSSON.

18.     WHOLESALE, the reincarnation of NATIONAL, continues to violate the Emergency Order.  Surveillance by DOT agents and roadside inspections by the California Highway Patrol have identified numerous instances in 2017 and 2018 of WHOLESALE operating tankers prohibited by the Emergency Order, in violation of federal law.

## IV.  APPLICABLE LAW

### A.     Welding Without Required Certifications

19.     The Hazardous Materials Transportation Statute ("HMTS"), Title 49, United States Code, Section 5101 *et seq.*, was enacted by Congress to protect people and property from

5

the dangers inherent in transporting hazardous materials. The regulations promulgated under the HMTS explicitly define hazardous materials to include crude oil and other petroleum products. The HMTS and the regulations enacted thereunder are administered and enforced by the USDOT.

20.     The HMTS requires the United States Secretary of Transportation (the "Secretary") to prescribe regulations for the safe transportation of hazardous materials in intrastate, interstate, and foreign commerce, and to regulate safety aspects of the transportation of hazardous materials. *See* 49 U.S.C. § 5103. These regulations apply to, among others, a person who transports hazardous materials in commerce or who causes hazardous materials to be transported in commerce. *See id.* For purposes of the regulations, "commerce" means trade or transportation in the jurisdiction of the United States between a place in a State and a place outside of the State; that affects trade or transportation between a place in a State and a place outside of the State; or on a United States-registered aircraft. *See* 49 U.S.C. § 5102(1).

21.     The HMTS requires the Secretary to designate material or a group or class of material as "hazardous" when the Secretary determines that transporting such material in commerce in a particular amount and form may pose an unreasonable risk to health and safety or property. *See* 49 U.S.C. § 5103.

22.     The Secretary has developed the Hazardous Materials Table (the "Table") that designates the materials listed therein as "hazardous materials" for the purpose of transporting those materials. The Table appears in Section 172.101 of Title 49 of the United States Code of Federal Regulations. For each listed material, the Table identifies the "hazard class" for the material and the United Nations ("UN") identification number for the material. *See* 49 C.F.R. § 172.101.

23.     Petroleum crude oil is listed in the Table as hazardous materials and has a UN identification number of UN1267. *See* 49 C.F.R. § 172.101.

6

24.     Each repair, modification, stretching, or rebarrelling of a specification cargo tank must be performed by a repair facility holding a valid National Board Certificate of Authorization for use of the National Board "R" Stamp and must be made in accordance with the edition of the National Board Inspection Code in effect at the time the work is performed. *See* 49 C.F.R. § 180.413(a)(1). Repairs, modifications, stretchings, and rebarrellings performed on non-ASME stamped specification cargo tanks may be performed by a cargo tank manufacturer holding a valid ASME Certificate of Authorization for the use of the ASME "U" Stamp using quality control procedures used to obtain the Certificate of Authorization. *See* 49 C.F.R. § 180.413(a)(1)(i)(A).

25.     The HMTS imposes a criminal penalty for any person who willfully or recklessly violates a regulation prescribed thereunder. *See* 49 U.S.C. § 5124(a). For purposes of HMTS, a person acts willfully when (1) the person has knowledge of the facts giving rise to the violation; and (2) the person has knowledge that the conduct was unlawful. *See* 49 U.S.C. § 5124(c). For purposes of HMTS, a person acts recklessly when the person displays a deliberate indifference or conscious disregard to the consequences of that person's conduct. *See* 49 U.S.C. § 5124(d).

**B.     Reincarnated Carriers**

26.     Under 49 Code of Federal Regulations, Part 385, Subpart L (49 C.F.R. § 385.1003), reincarnated (or "affiliated") carriers are defined as motor carriers with common ownership, common management, common control or common familial relationship.

27.     Under 49 Code of Federal Regulations, Part 385, Subpart L (49 C.F.R. § 385.1005), two or more motor carriers shall not use common ownership, common management, common control, or common familial relationship to enable any or all such motor carriers to avoid compliance, or mask or otherwise conceal non-compliance, or a history of non-compliance, with statutory or regulatory requirements prescribed under 49 U.S.C. Chapter 311, subchapter III, or with an order issued under such requirements.

7

28.     Under 49 Code of Federal Regulations, Subpart L (49 C.F.R. § 385.1017), any

motor carrier that the FMSCA determines to be in violation of this subpart shall be subject to the

civil or criminal penalty provisions of 49 U.S.C. § 521(b) and applicable regulations.

## V.   STATEMENT OF PROBABLE CAUSE

29.     Except as specified otherwise below, I know all of the following information

based on my review of investigative reports and materials, my conversations with USDOT SA

Michael Day and IRS-CI SA Kristina Warwick, and my own investigation of JOHANSSON and

the PROPERTY.

### A.     The Explosions

#### 1.     The Fatal 1993 Explosion

30.     After reviewing a Federal Highway Administration ("FHWA") report, dated on or

about December 3, 1992, I learned that Gary Burley, a Safety Specialist with the FHWA, Office

of Motor Carriers, conducted a compliance review of Ash, Inc. in Montebello, California and

noted that welding repairs were completed on cargo tank walls.  Ash, Inc. did not have an "R"

Stamp.

31.     After reviewing a letter written by JOHANSSON to "Gary" at the "Office of

Motor Carriers," dated on or about December 24, 1992, I learned that JOHANSSON was the

President and owner of Ash, Inc.  In the letter, JOHANSSON wrote that "we are in the process

of applying for an 'R' stamp" and "until such time as we are successful in acquiring the stamp, I

have instructed our Fleet Manager, George Granados [JOHANSSON's co-defendant in the

criminal case discussed below] that all reported leaks on cargo tanks will be sent out to an

authorized vendor for repairs."

32.     After reviewing court documents from *United States v. Carl Bradley Johansson*,

Case No. 98-CR-674-RAP (C.D. Cal.), I learned the following:

a.      On or about September 27, 1993, Leonardo Quintero, a welder at Atlas

Carrier, Inc. ("Atlas"), located in Montebello, California, was killed while working inside a

8

cargo tanker when his welding torch ignited fumes. Atlas, a hazardous-materials transportation company, was not registered with the USDOT to perform the repair of cargo tanks and did not have an "R" Stamp certification. JOHANSSON was the president and owner of Atlas, which did business under several names including Ash Transportation, Inc., Petroleum Delivery Services, and Ash Incorporated.

      b.      On or about June 24, 1998, JOHANSSON and an Atlas manager were indicted by a federal grand jury on five counts, specifically, one count of violating 18 U.S.C. § 371 and four counts of violating 49 U.S.C. § 5124.

      c.      According to JOHANSSON's plea agreement, on or about March 5, 1999, JOHANSSON pled guilty to charges in a three-count superseding information for violating:

      i.      18 U.S.C. § 371 (one count), for "conspiring to commit an offense against the United States, namely, to knowingly violate a regulation promulgated by the [USDOT] relating to hazardous materials," in violation of 49 U.S.C. § 5124;

      ii.      49 U.S.C. § 5124 (one count), for "knowingly violating a US DOT regulation, namely, causing a welder to make repairs on a cargo tanker at an unauthorized facility."

      iii.      18 U.S.C. § 371 (one count), for conspiring to "knowingly make materially false, fictitious, or fraudulent statement or representations within the jurisdiction of the United States government, namely, US DOT, in violation of 18 U.S.C. § 1001(a)(2)."

      d.      JOHANSSON's plea agreement contained a detailed Stipulated Statement of Facts in which JOHANSSON agreed that he had committed the foregoing crimes. After reviewing the transcript of JOHANSSON's interview with investigators from Cal OSHA[1] and DOT-OIG on or about January 9, 2015, I learned that JOHANSSON characterized his admissions in the 1999 plea agreement as "completely false."

---

[1] As used herein, "Cal OSHA" refers to the State of California, Department of Industrial Relations, Division of Occupational Safety and Health, Bureau of Investigations.

e.      According to the transcript of JOHANSSON's sentencing hearing, on or about April 7, 2000, JOHANSSON was sentenced to a term of 15 months' imprisonment followed by two years of supervised release for these violations.

f.      According to JOHANSSON's motion to end his supervised release early, after JOHANSSON's release from prison, he returned to the hazardous-materials transportation business with a company called Systems Logistics, which was located at the PROPERTY.[2]

2.      The 2012 Explosion at the PROPERTY[3]

33.      After reviewing an Incident Report, dated on or about September 26, 2012, from the City of Corona Fire Department, I learned the following:

a.      On or about September 25, 2012, the Corona Fire Department responded to an explosion at the PROPERTY.  The company based at the location was NATIONAL.  Fire officials made contact with NATIONAL's "facility manager," who claimed that an employee was conducting a welding operation inside a service bay when a nearby 55-gallon drum used for waste oil exploded, spraying debris and creating a large hole in the roof of the PROPERTY.

b.      The first page of the report listed "Brad Johnson" as the "MGR" of "National Distributor Serv."

---

[2] After reviewing a commercial insurance application by "Tech Logistics Corp. DBA Systems Logistics" to the Carolina Casualty Insurance Company, dated on or about July 1, 2008, I learned that JOHANSSON signed the application in his capacity as "Director."  After reviewing a Stipulation and Order of Rescission, filed on or about April 26, 2011, in *Carolina Casualty Insurance Company v. Tech Logistics Corp. dba Systems Logistics, Inc. et al.*, E.D. Cal. Case No. 1:10-cv-475-OWW-MJS, I learned that the parties agreed that the aforementioned application contained materially false or inaccurate representations, justifying rescission of the policy following a fatal crash of one of Systems Logistics' trailers on or about December 11, 2008 in Tulare, California.

[3] After reviewing an investigative report by SA Day, dated on or about June 1, 2017, I learned that SA Day learned from City of Corona Fire Inspector Diedre Locati that the parcel of land that is associated with the PROPERTY was subdivided at some point, which resulted in two addresses for the PROPERTY, 340 North Grant Avenue and 344 North Grant Avenue.  Both addressees correspond to the one main building located at the PROPERTY.

c.      Fire department officials were unable to locate the 55-gallon drum that supposedly had exploded, as well as the funnel and grate that had been on top of it, because NATIONAL's employees claimed to have moved the drum.

34.     After reviewing the transcript of the interview of Velasquez by Cal OSHA on or about July 3, 2014, I learned the following:

a.      Velasquez and Enciso were repairing a tanker when it exploded on or about September 25, 2012.

b.      In contrast to the account that NATIONAL's manager had provided to the Corona Fire Department, Velasquez said that he was welding on the tanker when it exploded, blowing the dome lid on top of the cargo tank into the ceiling at the PROPERTY, and causing a hole in the roof, in the same way that the May 6, 2014 explosion occurred.

35.     After reviewing the transcript of the interview of SPICER by Cal OSHA on or about May 12, 2014, I learned that SPICER said that, although he was in Las Vegas when the September 25, 2012 explosion occurred, he thought that the explanation that a drum had exploded "sounded suspect" and "didn't sound accurate."

3.      The Fatal 2014 Explosion at the PROPERTY

36.     Based on my review of an Investigation Report from the City of Corona Fire Department, dated on or about May 6, 2014, and an Incident Report from the City of Corona Fire Department, with a "printed" stamp of on or about June 5, 2014, I learned the following:

a.      On or about May 6, 2014, a DOT MC-306 specification cargo tank exploded at NATIONAL's main repair facility at the PROPERTY.  Specifically, two welders at the NATIONAL facility were working on the shell of the cargo tank to install a new dome-lid collar on the tank.  The tank had not been cleaned or purged of vapors prior to the welders commencing work on the tank.  Vapors were ignited by the welding activities and the explosion blew off the collar of the tank as well as both welders, Enciso and Velasquez.

11

b.      Enciso was dismembered and declared dead at the scene.  Velasquez was
hospitalized and suffered serious injuries.

37.      After reviewing photographs taken after the scene of the accident, I learned that
the cargo tanker involved had a Class 3 flammable placard visible on it with the numbers
"1267."  USDOT's Hazardous Materials Table indicates that 1267 is petroleum crude oil.  *See* 49
C.F.R. § 172.101.

38.      After reviewing a "Material Safety Data Sheet" for crude oil from Tesoro, a large
petroleum refinery, I learned that crude oil is flammable and toxic.

39.      After reviewing the September 9, 2014 sworn declaration of Donald Tomlinson
(the "FMSCA Report"), a Safety Investigator and Hazardous Materials Specialist for FMCSA, as
well as photographs associated with the report, I learned that there is a photograph that shows
residue consistent with crude oil dripping from the drain pipe on the side of the cargo tank that
exploded.

40.      After reviewing the transcript of the interview of Velasquez by Cal OSHA on or
about July 3, 2014, I learned the following:

a.      Velasquez had worked for NATIONAL for four years and had worked for
JOHANSSON under various company names since the 1990s.

b.      On or about May 6, 2014, the day of the explosion, NATIONAL's
Assistant Shop Manager, Juan Solis ("Solis"), told Velasquez that Velasquez was going to be
working on the vapor system of a tank that already was parked inside the PROPERTY.

c.      Solis told Velasquez to wait for GARCIA to "hear the final decision on
this."  GARCIA was NATIONAL's Shop Manager.

d.      Velasquez did not know what was in the tank but he crawled up the
tanker's ladder and looked inside the tank.  Velasquez did not see anything in the tank but noted
a "very strong" odor.

12

       e.      Velasquez said the following in his interview with the Cal OSHA Investigator: "I told Henry. Henry Garcia and Juan Solis. I told them. I remember I told them you cannot do the welding in this tank and they asked me why. This smell is very strong. It's very strong. The odor is very strong. Well, the boss wants it right away so they ordered the parts and we start cutting."

       f.      Velasquez was afraid of being sent home, without pay, if he did not comply with the order to fix the tank. In response to the questions, "So did Henry [GARCIA] ever tell you specifically, if you don't do it [the welding], I'll get somebody else to do it? You can go home?," Velasquez replied, "Yes."

       g.      After the necessary parts arrived to complete the welding job, Enciso and Velasquez began welding on top of the tanker while GARCIA stood nearby. Shortly thereafter, the explosion happened.

    41.    After reviewing Velasquez's signed statement to FMCSA, dated on or about July 22, 2014, I learned that Velasquez stated the following:

       a.      Velasquez did not prepare paperwork for the welding he performed on NATIONAL's DOT-specification cargo tanks because NATIONAL did not allow him to because NATIONAL lacked the necessary permits.

       b.      GARCIA directed Velasquez not to document these repairs.

       c.      When Velasquez requested to send cargo tanks out to the wash racks to be cleaned and purged, his request was denied.

    42.    After reviewing Velasquez's signed statement to FMCSA, dated on or about September 5, 2014, I learned that when Velasquez was asked what functions JOHANSSON carried out at NATIONAL, Velasquez responded, "He was representing himself as the Boss."

    43.    After reviewing the sworn statement, dated on or about August 7, 2014, that Solis provided to FMCSA, I learned the following:

13

      a.     Solis stated that GARCIA directed Enciso and Velasquez to perform the welded repairs on DOT-specification cargo tanks, and that GARCIA "approved all repairs" that Enciso and Velasquez were to make on or about May 6, 2014. Specifically, in response to the question, "Who directed Samuel Enciso and Daniel Lopez Velasquez to weld the new dome lid collar and cap the vapor valve flange on May 6, 2014?," Solis replied, "Henry."

      b.     Solis said that he contacted JOHANSSON in order to buy parts or make repair decisions for NATIONAL's trucks and trailers.

44.     After reviewing the transcript of SPICER's interview with Cal OSHA on or about May 12, 2014, I learned the following:

      a.     Rich Staley was SPICER's supervisor and was in charge of safety at NATIONAL.

      b.     Staley was at the PROPERTY when the explosion happened on or about May 6, 2014, but he fled the scene. According to SPICER, Staley "was the first one out of the gate and gone. Gone, gone, gone."

      4.     <u>JOHANSSON's Sworn Statement Denying That He Discussed the Repair of the Tanker with GARCIA Prior to the May 2014 Explosion</u>

45.     Based on my review of the transcript of the interview of JOHANSSON by Cal OSHA and DOT-OIG on or about January 9, 2015, I know the following:

      a.     At the beginning of the interview, JOHANSSON, whose attorney was present, was informed that, because USDOT-OIG Special Agent Heidi Ficke was present, "any statement you make is subject to 18 U.S.C. § 1001. So you can't make a false or misleading statement. You could be prosecuted." JOHANSSON replied, "Okay. I'll answer them truthfully."

      b.     When JOHANSSON was asked, "Did you have any discussions with Henry [GARCIA] prior to the incident about repairs of that trailer?," JOHNASSON replied, "No."

14

c.      When JOHANSSON was then asked, "So the first time you were aware something was going on was the incident itself?," JOHANSSON replied, in relevant part, "I had no idea the trailer was back there.  Had no idea it was dropped off.  Had no idea Henry had talked to anybody about anything that may or may not have been wrong with it."

5.    Video Footage of the May 2014 Explosion

46.    After reviewing surveillance footage captured by cameras inside the PROPERTY on or about May 5 and 6, 2014, and discussing the footage with a Deputy District Attorney from the Riverside County District Attorney's Office, I learned the following:

a.      As of on or about May 6, 2014, the PROPERTY had at least fifteen video cameras that captured footage of the interior and exterior of the main structure on the PROPERTY, where welding on cargo tankers took place.  The footage was saved to two DVRs, which were taken into custody by an investigator from the Riverside County District Attorney's Office on or about May 6, 2014.

b.      When the DVRs were taken into custody on or about May 6, 2014, footage from the previous several days was saved inside the DVRs.  All of the footage that I watched had date and time stamps, identifying when the footage was taken.

c.      I watched footage with a date stamp of on or about May 5, 2014, which showed that JOHANSSON walked down the stairs from his office inside the PROPERTY's building at approximately 12:34 p.m.  A few minutes later, the tanker that exploded the next day (license plate 4MN4880) was backed into the building through an open bay door.  At approximately 12:38 p.m., JOHANSSON and GARCIA had a conversation directly in front of the same tanker.  While there is no audio for the surveillance footage, I believe that JOHANSSON and GARCIA were discussing repairs that were to be made to the tanker because:

i.      JOHANSSON and GARCIA were standing directly in front of the tanker;

15

ii.    During the conversation, GARCIA pointed to the top of the tanker (to the spot where Enciso and Velasquez made the fatal repairs the next day) approximately four times;

iii.    While GARCIA was pointing to the top of the tanker where the welding would be conducted the next day, JOHANSSON walked over a few steps to get a better view of that section of the tanker; and

iv.    During the conversation, GARCIA picked up what looks like a spare part from what looks like a welding table and showed it to JOHANSSON.

d.    I watched footage with a date stamp of on or about May 6, 2014, which showed the explosion of the same tanker, in the same location, from several angles.  According to the footage, the explosion occurred at approximately 12:44 p.m.  The footage showed Enciso and Velasquez being blown off the top of the tanker and landing violently on the ground on opposite sides of the tanker, while GARCIA was standing nearby.

6.    JOHANSSON's Additional Efforts to Obstruct the Investigation into the May 2014 Explosion

47.    After reviewing the transcript of Martin Gonzalez's interview by Cal OSHA on or about August 21, 2014, I learned the following:

a.    Gonzalez confirmed that a driver from his company, Power Petroleum, had dropped off the tanker that exploded at the PROPERTY.

b.    Gonzalez said that, after the explosion, JOHANSSON had insisted to him and Victor Robles (Gonzalez's partner at Power Petroleum) that the tanker that exploded belonged to Power Petroleum.  Gonzalez said that NATIONAL, not Power Petroleum, owned the tanker.

48.    After reviewing the transcript of Victor Robles's interview by Cal OSHA on or about August 21, 2014, I learned the following:

16

a.     Robles confirmed that the tanker that exploded was owned by
NATIONAL but used by Power Petroleum.

b.     Robles said that, after the explosion, JOHANSSON suggested to him that
he (Robles) tell investigators that someone at Power Petroleum had purged (*i.e.*, removed the oil
from) the tanker that exploded prior to dropping the tanker off at the PROPERTY for repairs to
be completed by NATIONAL.  Robles said that he (Robles) knew that was false because Power
Petroleum never had purged NATIONAL's tankers.

49.     After reviewing the transcript of Max Castaneda's interview by Cal OSHA on or
about August 21, 2014, I learned the following:

a.     Castaneda said he that he had worked as a driver for Power Petroleum.

b.     Castaneda remembered a conversation that he had had with JOHANSSON
and Robles at the PROPERTY after the May 6, 2014 explosion, when JOHANSSON had told
Robles, "[H]ey, just tell them [*i.e.*, the investigator who was at the PROPERTY that day] that
you purged the tank and that's it."  According to Castaneda, JOHANSSON also said to Robles,
"[H]ey, I got an investigator upstairs.  Let's go talk to him.  He just wants to know that you guys
brought the trailer, you know, and just tell him that you guys cleaned it."

c.     Castaneda said that Power Petroleum never worked on JOHANSSON's
trailers, and "we weren't allowed to work on them."

7.     Control of the Tanker That Exploded in May 2014

50.     After reviewing a Corona Fire Department Investigation Report, dated on or about
May 6, 2014, I learned that the tanker involved in the explosion was a 1987 Fruehauf Tanker
Trailer,  VIN 1H4T04328JC015202, license plate 4MN4880, Unit # 678238.

51.     After reviewing the California DMV registration, dated on or about January 6,
2014, for the tanker involved in the May 6, 2014 explosion (VIN 1H4T04328JC015202, license

plate 4MN4880), I learned that the registered owner of the tanker was listed as "TRKG EQP CO INC" with an address of 886 Darwin Road, Hudson, Wisconsin, 54016.[4]

52.    After reviewing a Wisconsin Domestic Corporation Annual Report form, dated on or about September 18, 2003, for Trucking Equipment Co., Inc., I learned that the form listed "Kimberly Ord" as the President, Vice President, Secretary, and Treasurer of the company.  The company's address was listed on the form as 886 Dorwin Road, Hudson, Wisconsin 54016.  According to the Wisconsin Secretary of State's website, the company was administratively dissolved by the state in 2009.

53.    After reviewing a U.S. Post Office P.O. Box application, I learned that, on or about November 20, 2002, Kimberly Ord applied for a P.O. Box (# 8093) in Newport Beach and listed "Trucking Equipment Co., Inc." as an additional name to which the P.O. Box was assigned.

54.    After reviewing a transcript of a deposition of JOHANSSON, dated on or about February 27, 2008, I learned that JOHANSSON said that he had married Kimberly Ord in 1990 but he claimed that they had been separated since the late 1990s.

55.    After reviewing the documents discussed below, I came to the conclusion that JOHANSSON and Kimberly Ord maintain a close relationship and that Kimberly Ord has been involved in the ownership of tanks at the PROPERTY, at a minimum.

a.    Based on my review of a County of Riverside Department of Environmental Heath form entitled, "Underground Storage Tank System - Ownership Transfer Form," dated on or about December 8, 2015, which listed the PROPERTY as the address for WHOLESALE, I learned that "Kim Ord" filled out the form and represented that, "I, Kim Ord, am requesting that the operating permits for Wholesale Distribution, Inc. be transferred to me as the new owner."

---

[4] After consulting Google Maps, I learned that no such address exists.  There is, however, the address of 886 Dorwin (with an "o") Road in Hudson, Wisconsin.  According to Google Maps, the address comprises a vacant lot.

b.      Based on my review of a document entitled, "Constituent Profile: Brad Johansson," dated on or about November 10, 2015, I learned the following:

i.      According to Orange Lutheran High School, where JOHANSSON's four children attended, JOHANSSON's marital status was listed as "Married" and his spouse was listed as "Kimberly Johansson."

ii.      The addresses listed for both JOHANSSON and Kimberly Johansson were the same:  P.O. Box 7043 in Newport Beach, the same P.O. Box that "Kimberly Ord" applied for in 2002.

c.      After reviewing a document from the U.S. Postal Service, printed on or about February 23, 2017, entitled "Edit 1093 for Boxes/Services," I learned that P.O. Box 7043 remained registered to "Kimberly Ord" as of on or about February 23, 2017, and that the "Additional Names" associated with the P.O. Box were "Carl Brad Johansson," "Carl Bradley Johansson," and "First Fidelity Leasing."

d.      After reviewing a document from the U.S. Postal Service, printed on or about February 23, 2017, entitled "Edit 1093 for Boxes/Services," I learned that P.O. Box 8093 remained registered to "Kimberly Ord" and the "Lundval Family Trust Inc." as of on or about February 23, 2017.[5]

e.      Based on my review of documents entitled "Orange Lutheran High School:  On-Campus Financial Agreement," dated on or about March 19, 2010, February 27, 2011, February 19, 2012, March 17, 2012, February 21, 2013, February 25, 2013, February 28, 2014, May 6, 2014, and February 18, 2015, I learned that each one was signed either by JOHANSSON (who identified himself as "Father") or "K. Johansson" (who identified herself as mother), and each one listed the same email address, daytime phone number, and address (P.O.

_____

[5] After reviewing a Deed of Trust, dated on or about November 7, 2002, for the PROPERTY, I learned that Kimberly Ord was listed as the President of the Lundval Family Partnership and JOHANSSON was listed as its Secretary.

19

Box 7043 in Newport Beach), and each one listed the same home phone number or left that field blank.

**B.    NATIONAL's Lack of "R" Stamp Certification and JOHANSSON's Knowledge of "R" Stamp Violations**

1.    NATIONAL's Lack of "R" Stamp Certification

56.    After reviewing the FMCSA Report, I learned the following:

a.    NATIONAL was not a cargo tank shop or repair facility registered with the USDOT, and did not hold a National Board Certificate of Authorization "R" Stamp or a valid ASME "U" Stamp.

b.    NATIONAL was not authorized to conduct repairs to DOT-specification cargo tanks.  Because NATIONAL was a motor carrier operating DOT-specification cargo tanks, it was required to have repairs to its DOT-specification cargo tanks performed by a manufacturer or cargo tank repair facility holding a National Board Certificate of Authorization "R" Stamp or a valid ASME "U" Stamp.

57.    After reviewing SA Day's investigative report, dated on or about May 31, 2017, as well as the accompanying "Accreditation of 'R' Repair Organizations" (published by the National Board of Boiler and Pressure Vessel Inspectors) and an email dated on or about May 26, 2017 from Gary Scribner to SA Day, I learned the following:

a.    On or about May 17, 2017, SA Day interviewed Scribner, the Manager of Technical Services at the National Board of Boiler and Pressure Vessel Inspectors.  Scribner's organization was responsible for granting "R" Stamp certifications.

b.    According to Scribner, the "R" Stamp certification is internationally recognized and it is earned and held by the company, which is then responsible for qualifying the welder.

c.    According to Scribner, obtaining an "R" Stamp is a rigorous process. Prior to issuance or renewal of the "R" Stamp, the repair organization, its written Quality

20

System, and its facilities are subject to a review and verification of implementation of its written Quality System by a Review Team.  The organization shall demonstrate sufficient implementation of the written Quality System to provide evidence of the organization's knowledge of repair or alteration activities appropriate for the requested scope of work.  The demonstration may be performed using current work, a demonstration mock-up, or a combination of both.

        d.     The founding purpose of the "R" Stamp program was safety to the general public by maintaining pressure equipment in a safe operating condition.

        e.     The "R" Stamp program highlights a company's ability to provide quality workmanship through an understanding of proper materials, design, welding and testing, which ensures the safety of personnel and continued safe operation of equipment.

        f.     NATIONAL never had an "R" Stamp certification.

        2.     <u>JOHANSSON's Knowledge of Welding Certifications and Welding Activity at NATIONAL</u>

58.     As set forth above, on December 24, 1992, JOHANSSON wrote a letter to a federal regulator stating that "we are in the process of applying for an 'R' stamp" and "until such time as we are successful in acquiring the stamp, I have instructed our Fleet Manager, George Granados that all reported leaks on cargo tanks will be sent out to an authorized vendor for repairs."  Seven months later, Leonardo Quintero, a welder at Atlas (which JOHANSSON owned), was killed while working inside a cargo tanker when his welding torch ignited fumes.

59.     As set forth above, JOHANSSON's plea agreement in his previous criminal case shows that he pled guilty on or about March 5, 1999 to, *inter alia*, one count of violating 18 U.S.C. § 5124 for the repair of a cargo tank at a facility that did not hold a valid "R" Stamp.

60.     After reviewing the FMSCA Report, I learned the following:

        a.     During a compliance review at NATIONAL that started in July 2014, the investigator observed four large MIG welding units at NATIONAL's shop at the PROPERTY.

GARCIA told the FMSCA Investigator that no welded repairs were conducted on-site and then "dared" the investigator to find any record of welded repairs being conducted.

      b.      The investigator nonetheless found records at the PROPERTY that showed Enciso and Velasquez had performed numerous welded repairs on DOT-specification cargo tanks prior to the May 6, 2014 explosion. It appeared to the investigator that NATIONAL had destroyed similar documentation.

      61.      After reviewing the transcript of Martin Gonzalez's interview by Cal OSHA on or about August 21, 2014, I learned that Gonzalez said that he had seen NATIONAL's shop personnel conducting welding on his trucks at the PROPERTY and that he knew that JOHANSSON was aware of the welding because he had been present with JOHANSSON and GARCIA when such welding was taking place.

      62.      After reviewing the transcript of Max Castaneda's interview by Cal OSHA on or about August 21, 2014, I learned that Castaneda said that he had been present at the PROPERTY on several occasions when JOHANSSON was watching people, including "Sam" (Enciso), welding tankers.

      63.      After reviewing the transcript of the interview of Gabriel Cuevas, Jr. ("Cuevas, Jr.") by Cal OSHA on or about July 31, 2014, I learned the following:

      a.      Cuevas, Jr. said that he worked at NATIONAL from 2012 to 2014. He worked almost 40 hours a week at NATIONAL and that there was "a lot" of welding being done at NATIONAL.

      b.      Cuevas, Jr. said that he recalled welding being done on the cargo tanks at least every three days on average.

      c.      Cuevas, Jr. also said, "I think my dad got written up because Brad saw my dad opening up something while Sam was welding something, so my dad got sent home because I think he was opening up and like fumes were sneaking out toward where Sam was at."

64.     After reviewing surveillance footage from the PROPERTY's security cameras and investigator's photographs of the interior of the PROPERTY's building, as well as SA Day's investigative report, dated on or about March 10, 2017, I learned that the office inside the building was positioned in such a way that JOHANSSON had to walk through the shop, where welding was done, in order to access the office.

**C.      The August 2014 Emergency Order**

65.     After reviewing FMCSA's Out-of-Service Order (the "Emergency Order"), dated on or about August 14, 2014, and a related memorandum prepared by the California Highway Patrol ("CHP"), I learned that, on or about August 14, 2014, FMCSA personally served JOHANSSON with the Emergency Order which stated that NATIONAL, JOHANSSON, and TankServices were prohibited from:

a.      "filling and/or offering, and/or requiring, permitting or allowing any other person to fill and/or offer, any cargo tank or cargo tank vehicle owned, leased, and/or operated by or on behalf of National Distribution Services, Inc., specifically including, but not limited to, the cargo tanks listed in Appendices A and B in the Order, for the transportation of hazardous materials";[6]

b.      "transporting, and/or requiring, permitting or allowing any other person to transport, hazardous materials in any cargo tank or cargo tank motor vehicle owned, leased, and/or operated by or on behalf of National Distribution Services, Inc., specifically including, but not limited to, the cargo tanks listed in Appendices A and B of the Order";

c.      "conducting any welded repair to any DOT specification cargo tank, specifically including, but not limited to, the cargo tanks listed in Appendices A and B of this Order";

---

[6] A true and correct copy of Appendices A and B to the Emergency Order is attached hereto as Exhibit 1.

23

      d.     "requiring, permitting or allowing any other person to conduct any welded repair to any cargo tank or cargo tank motor vehicle unless such repair is conducted in accordance with 49 C.F.R. § 180.413"; and

      e.     "conducting any inspection and/or testing on any cargo tank or cargo tank motor vehicle and/or permitting any person to conduct any inspection and/or testing on any cargo tank or cargo tank motor vehicle unless such person has a current valid registration in accordance with 49 C.F.R. Part 107, and inspections and tests are conducted by a Registered Inspector familiar with DOT-specification cargo tanks, trained and experienced in the use of the inspection and testing equipment needed, and has the training and experience required to meet the definition of 'registered inspector' as set forth in 49 C.F.R. § 171.8."

66.     After reviewing the FMCSA Report, an investigative memorandum dated on or about March 19, 2018 from SA Day, and litigation documents from the USDOT Pipeline and Hazardous Materials Safety Administration ("PHMSA") (discussed below), and speaking with FMCSA attorney Nancy Jackson, I learned the following:

      a.     Appendix B to the Emergency Order represents the cargo tankers used by NATIONAL that were identified by FMCSA as having been welded on and posing a great risk. Appendix A represents tankers for which NATIONAL could not produce proper pressure-testing documentation.

      b.     Cargo tankers listed on Appendix A and Appendix B were prohibited from hauling, *inter alia*, gasoline (USDOT placard 1203) and certain denatured alcohols such as ethanol (USDOT placard NA 1987).

      c.     On or about August 20 and 21, 2014, NATIONAL submitted documentation of successful completion of certain tests and inspections as required under 49

24

C.F.R. § 180.407(c). As a result, FMCSA partially rescinded the Emergency Order, on or about August 22, 2014, to remove five tankers[7] from Appendix A.

        d.      The other 30 tankers listed in Appendix A to the Emergency Order remained (and remain today) ordered out-of-service. Appendix B has seven tankers on it; none of these has been allowed back in service. Accordingly, from August 14, 2014 to the present, the Emergency Order has prohibited NATIONAL from operating 37 tankers to haul gasoline and ethanol. As set forth below, entities controlled by JOHANSSON have continued to operate approximately half of the tankers (if not more) in a prohibited manner.

### D.    Violations of the Emergency Order by NATIONAL and WHOLESALE

        1.    Violations of the Emergency Order by NATIONAL in Late 2014

67.    Based on my review of filings from NATIONAL's litigation challenging the Emergency Order in proceedings before PHMSA, I learned the following:

        a.      On or about September 3, 2014, NATIONAL filed a Petition for Review of the Emergency Order, challenging the validity of the Emergency Order.

        b.      On or about October 3, 2014, PHSMA's Chief Safety Officer issued an 11-page single-spaced order upholding the Emergency Order (except that JOHANSSON was removed from the Emergency Order as a named party).

        c.      On or about June 8, 2016, the United States Court of Appeal for the District of Columbia denied NATIONAL's petition for review (Case No. 14-1254) and held that substantial evidence supported PHSMA's decision.

68.    Based on my review of a letter from FMCSA to NATIONAL, dated April 6, 2015 (the cover page of the letter mistakenly says April 6, 2014), I learned the following:

        a.      FMSCA began investigating NATIONAL's compliance with the Emergency Order on or about February 19, 2015.

---

[7] The five tankers removed from Appendix A were #21A (license plate 4MP5575), #23A (license plate 4GX6514), #30 (license plate 8X55821), #30A (license plate 4JP2281), and #44774 (serial number OMX739606).

25

b.      On or about April 6, 2015, FMCSA issued a Notice of Claim for a civil penalty against NATIONAL in the amount of $251,000 for NATIONAL's violations of the Emergency Order.  The fines were based on ten violations of 49 U.S.C. §§ 521(b)(2)(F)/5121(d) (in the amount of $25,000 per violation) for "Operating a commercial motor vehicle in commerce in violation of an imminent hazard out of service order issued under 49 USC 5121(d)" (as well as one violation of 49 U.S.C. §§ 521(b)(2)(E)/5121(c) for failure to allow FMCSA to inspect records, which resulted in a $1,000 civil penalty).

c.      Attached to the Notice of Claim was a table listing NATIONAL's daily violations of the Emergency Order during a ten-day span from December 1, 2014 to December 10, 2014, which I have narrowed and condensed below:

| APPROXIMATE DATE | VEHICLE NUMBER | CARGO |
|---|---|---|
| 12/1/2014 | 29A | Gasoline |
| 12/1/2014 | 17A | Gasoline |
| 12/1/2014 | 19A | Gasoline |
| 12/1/2014 | 43121 | Gasoline |
| 12/1/2014 | 44338 | Gasoline |
| 12/1/2014 | 43121 | Gasoline |
| 12/2/2014 | 29A | Gasoline |
| 12/2/2014 | 43121 | Gasoline |
| 12/2/2014 | 17A | Gasoline |
| 12/3/2014 | 29A | Gasoline |
| 12/3/2014 | 44338 | Gasoline |
| 12/3/2014 | 17A | Gasoline |
| 12/4/2014 | 17A | Gasoline |

26

| APPROXIMATE DATE | VEHICLE NUMBER | CARGO |
|---|---|---|
| 12/4/2014 | 19A | Gasoline |
| 12/4/2014 | 44338 | Gasoline |
| 12/4/2014 | 29A | Gasoline |
| 12/5/2014 | 17A | Gasoline |
| 12/5/2014 | 19A | Gasoline |
| 12/5/2014 | 44338 | Gasoline |
| 12/5/2014 | 29A | Gasoline |
| 12/5/2014 | 43121 | Gasoline |
| 12/6/2014 | 19A | Gasoline |
| 12/6/2014 | 43121 | Gasoline |
| 12/6/2014 | 44338 | Gasoline |
| 12/6/2014 | 17A | Gasoline |
| 12/6/2014 | 29A | Gasoline |
| 12/6/2014 | 44338 | Gasoline |
| 12/7/2014 | 29A | Gasoline |
| 12/7/2014 | 44338 | Gasoline |
| 12/7/2014 | 43121 | Gasoline |
| 12/8/2014 | 44338 | Gasoline |
| 12/8/2014 | 43121 | Gasoline |
| 12/9/2014 | 22A | Gasoline |
| 12/9/2014 | 43121 | Gasoline |
| 12/9/2014 | 44338 | Gasoline |
| 12/9/2014 | 17A | Gasoline |

| APPROXIMATE DATE | VEHICLE NUMBER | CARGO |
|---|---|---|
| 12/9/2014 | 29A | Gasoline |
| 12/9/2014 | 44338 | Gasoline |
| 12/10/2014 | 29A | Gasoline |
| 12/10/2014 | 43121 | Gasoline |
| 12/10/2014 | 17A | Gasoline |
| 12/10/2014 | 22A | Gasoline |

69.     Based on my discussions with Jackson, the FMCSA attorney who handled the Notice of Claim, I learned that NATIONAL never paid the $251,000 civil penalty. Jackson reported to me that, instead of complying with the Emergency Order or paying the civil penalty, NATIONAL began operating as a "new" company under the name of WHOLESALE.

2.     Violations of the Emergency Order Identified During Surveillance

70.     From reviewing SA Day's investigative reports, dated on or about February 2, February 10, June 29, and August 14, 2017, I learned the following:

a.     On or about January 24, 2017, SA Day saw the tanker with license plate 4HG9973 (listed on the Emergency Order) moving on Grant Avenue outside of the PROPERTY. The tanker had a class-three flammable hazardous-material placard visible with the number 1203, indicating that it was hauling, or had been hauling, gasoline.

b.     On or about January 24, 2017, SA Day saw the tanker with the plate 4LW6989 (listed on the Emergency Order) moving on Grant Avenue outside of the PROPERTY. The tanker also had a class-three flammable hazardous-material placard visible with the number 1203, indicating that it was hauling, or had been hauling, gasoline.

c.     On or about June 28, 2017, SA Day conducted surveillance at a Chevron loading rack in Huntington Beach and saw a truck with "Quality Services" on the door hauling a

28

cargo tanker pull into the loading rack and then pull out a short time later. It had the tank unit number 44098 on the side of the tanker and the California license plate 4DF3174, and was listed on the Emergency Order. The tanker was registered to the same company (Trucking Equipment Co., Inc.) and the same address (886 Dorwin Road, Hudson City, WI 54016) as the tanker involved in the explosion that killed Enciso in May 2014. The tanker had a 1203 placard on it, indicating that it was carrying gasoline. SA Day followed this tanker to Lake Elsinore, California and saw it off-loading at a Chevron gas station. SA Day obtained the Chevron bill of lading ("BOL") and the Quality Services freight bill from the Chevron clerk shortly after the delivery was made. The BOL stated that the tanker had delivered 5,081 gallons of gasoline to the Chevron station that day.

           d.      On or about August 11, 2017, SA Day saw a truck with "Quality Services" on the door hauling a cargo tanker heading southbound on Etiwanda Avenue but north of the I-10 freeway. The tanker had a California license place 4DF2837 (listed on the Emergency Order), and placard 1987 (indicating possible ethanol). The tanker also was registered to the same company (Trucking Equipment Co., Inc.) and the same address (886 Dorwin Road, Hudson City, WI 54016) as the tanker involved in the explosion that killed Enciso in May 2014. Based on SA Day's surveillance of the route that tankers take when exiting a nearby load rack that dispenses only ethanol, it appeared to SA Day that the tanker had already visited the load rack and was heading out to make its delivery.

        71.      Based on my review of an investigative report, dated on or about February 26, 2018, by USDOT-OIG Special Agent-in-Charge ("SAC") William Swallow, I know the following:

           a.      On or about February 24, 2018, SAC Swallow saw cargo tanker # 44098 with license plate 4DF3174 (listed on the Emergency Order) displaying a "Quality Services" sign.

b.      The tanker was displaying a "1203" placard, corresponding to gasoline. The tanker appeared to be off-loading fuel at the Chevron gas station located at 25361 Railroad Canyon Road in Lake Elsinore.

3.      <u>Additional Violations of the Emergency Order Identified in the California Highway Patrol's Inspection Reports</u>

72.      After reviewing "Driver/Vehicle Examination Reports" provided to me by the CHP in February 2018, and speaking with CHP Officer Craig Linville about those reports on or about February 13, 2018, I learned the following:

a.      The CHP typically drafts a report when it inspects a tanker at one its roadside truck-inspection facilities.  At my request, the CHP was able to pull reports for inspections that it had conducted on tankers listed in the Emergency Order, and the CHP then provided those reports to me.

b.      The CHP inspection reports do not always specify the type of hazardous material that an inspected tanker is carrying.  Each of the inspection reports has a "Cargo" field, but the entry in that field is not always specific.  For example, some of the reports list the cargo as "hazardous materials" or "fuel" rather than specifying gasoline, ethanol, or other products.

c.      From the CHP inspection reports, I identified the following instances when one of the tankers listed on the Emergency Order was inspected by the CHP and where the inspection report specified that (1) the tanker was being operated by NATIONAL or WHOLESALE and (2) the tanker was carrying a substance that is prohibited by the Emergency Order:

| Approximate Date | Inspection Site | Tanker License Plate | Cargo |
|---|---|---|---|
| 1/30/2015 | Rainbow CVEF | 4FU7543 | Gasoline |
| 3/7/2015 | San Onofre | 4DF2837 | Gasoline |
| 8/17/2015 | San Onofre | 4FU7543 | Gasoline |

30

| Approximate Date | Inspection Site | Tanker License Plate | Cargo |
|---|---|---|---|
| 9/16/2015 | Cajon Scales | 4HH9199 | Gasoline |
| 11/18/2015 | Rainbow CVEF South | 4HH9199 | Gasoline |
| 12/15/2015 | Peralta Scales | 8N87678 | Gasoline |
| 12/15/2015 | Cajon Scales | 4HH9199 | Gasoline |
| 12/17/2015 | Cajon Scales | 4HH9199 | Gasoline |
| 5/18/2016 | San Onofre | 4DF2837 | Gasoline |
| 6/8/2016 | E/B Peralta (Anaheim) | 4DF2837 | Gasoline |
| 9/22/2016 | Bloomington | 8L28553 | Gasoline |
| 6/26/2017 | Cajon Scales | 8F81338[8] | Gasoline |
| 6/26/2017 | Cajon Scales | 4HG9973 | Gasoline |
| 9/16/2017 | San Diego Farm Tank | 4LP1539 | Denatured ethanol |
| 10/26/2017 | Orange County | 4FU9764 | Gasoline |
| 11/27/2017 | San Onofre | 4AS5324 | Ethanol |
| 1/22/2018 | San Onofre | 4DF2837[9] | Gasoline |

---

[8] According to the report, the tanker was displaying the wrong license plate, apparently in an effort to conceal the fact that its registration had expired. The license plate that the tanker was displaying, 8F78952, also is listed on the Emergency Order.

[9] Based on my review of SA Day's investigative report, dated on or about January 25, 2018, I learned that SA Day had interviewed the CHP officer who conducted this inspection and the officer confirmed that the tanker was hauling unleaded gasoline.

E.    **JOHANSSON's Control of NATIONAL**

     1.    NATIONAL's Corporate Structure

    73.    After reviewing business documents filed with the State of Nevada, I learned the following:

    a.    NATIONAL was incorporated in the State of Nevada on or about December 14, 2007. The original Articles of Incorporation show that William B. Scott, Sr. and William B. Scott, Jr. were listed as Directors/Trustees of NATIONAL's board. The Nevada Secretary of State's Initial List of Officers, Directors, and Resident Agent form ("Officer Form"), dated on or about December 28, 2007, indicates that Scott, Sr. was the President, Secretary, Treasurer, and Director of NATIONAL.

    b.    On or about July 19, 2010, a letter was filed with the State of Nevada stating the resignation of Scott, Sr. from NATIONAL.

    c.    On or about December 23, 2010, NATIONAL filed an annual Officer Form is filed stating that "John Doe" was NATIONAL's President, Secretary, and Treasurer. "William Scott" was listed as the Director.

    d.    Annual Officer Forms from 2011 and 2012 stated that "William Scott" was the President, Secretary, Treasurer, and Director of NATIONAL.

    e.    On or about February 20, 2013, "William Scott" filed paperwork stating his resignation from NATIONAL. A 2013 Annual Officer Form indicates that "Keith Golatta" was the President, Secretary, Treasurer, and Director of NATIONAL.[10]

    f.    An annual Officer Form, dated on or about May 30, 2014, listed JOHANSSON as the President, Secretary, Treasurer, and Director of NATIONAL.

---

[10] Based on my discussions with SA Day, I know that SA Day has been unable to locate "Keith Golatta" in public records databases and he suspects that "Keith Golatta" is one of JOHANSSON's many aliases (along with "Keith Ash"). Based on my review of the transcript of JOHANSSON's interview by Cal OSHA on or about January 9, 2015, I know that JOHANSSON said that he had never met "Keith Golatta" but sometimes would sign official corporate documents in Golatta's name.

g.      An annual Officer Form, dated on or about August 11, 2014, stated that "Will Scott" was the President, Secretary, Treasurer, and Director of NATIONAL.  An annual Officer Form, dated on or about February 26, 2015, listed the same titles for "Will Scott."

74.      After reviewing the FMSCA Report, I learned the following:

a.      NATIONAL operated as a motor carrier from its principal place of business at the PROPERTY.

b.      The Las Vegas address that NATIONAL provided to FMCSA as its physical address and principal place of business was a rented office space.  No NATIONAL managers or employees reported to, or worked at, the Las Vegas location.  No motor carrier operations were conducted at the Las Vegas location and no motor carrier records were maintained at that location.

2.      The Relationship Between JOHANSSON and Scott, Jr.

75.      After reviewing Court records from JOHANSSON's previous criminal case, Case No. 98-CR-674-RAP (C.D. Cal.), I learned that JOHANSSON surrendered himself for his 15-month prison term on or about June 9, 2000 at Nellis Federal Prison Camp in Nevada.  After reviewing Court records from *United States v. William B. Scott, Jr.*, CR-S-95-312-ECR (D. Nev.), I learned that Scott, Jr. voluntarily surrendered himself to Nellis Federal Prison Camp on or about February 10, 2000 for a 120-month prison sentence for conspiracy, wire fraud, and money laundering.  Based on these records, it is possible that JOHANSSON met Scott, Jr. at Nellis Federal Prison Camp in 2000.

76.      After reviewing a letter, dated April 3, 2009, that JOHANSSON submitted to Scott, Jr.'s probation officer, I learned that JOHANSSON wrote the letter on "TPG" letterhead and claimed that "William has been with our company since June 2007" and that Scott, Jr. was

33

TPG's employee.[11]  After reviewing an accompanying letter that Scott, Jr. wrote to the Honorable Edward Reed, Senior United States District Judge for the District of Nevada, seeking an early release from his three-year term of probation, I learned that Scott, Jr. was released from Nellis Federal Prison Camp on or about May 1, 2007.

77.     After reviewing a document from NATIONAL entitled, "Terminal Phone List: August 27, 2013," I learned that JOHANSSON had a telephone extension based at the PROPERTY but Scott, Jr.'s business phone, cell phone, and fax number all had a Las Vegas area code and Scott, Jr.'s address was in Las Vegas as well.

78.     After reviewing a document entitled, "National Distribution Services, Inc.: Employee Contact List," dated on or about May 15, 2014, I learned that it included JOHANSSON but not Scott, Jr.

79.     After reading an online obituary, I learned that Scott, Jr. died on or about March 6, 2015.

### 3.     JOHANSSON's Attempt After the Explosion to Cast Himself As a Temp for Kimco Staffing

80.     After reviewing the transcripts of interviews of JOHANSSON by DOT-OIG and Cal OSHA on or about November 21, 2014 and January 9, 2015, I learned the following:

a.     JOHANSSON described himself as a "paper pusher" at NATIONAL.  He said that his title at NATIONAL was Administrative Manager.  JOHANSSON said that he did not receive a paycheck from NATIONAL.  Rather, JOHANSSON said that he was paid by a staffing company called Kimco Staffing ("Kimco").  On or about January 9, 2015, JOHANSSON claimed that he had been on Kimco's payroll "[f]or a year."

---

[11] As discussed below, "TPG" is Trimac Petroleum Group, another entity controlled by JOHANSSON and based at the PROPERTY.  After reviewing the transcript of JOHANSSON's interview with Cal OSHA and DOT-OIG on or about January 9, 2015, I learned that JOHANSSON claimed that he had never worked with Scott, Jr. at another company before NATIONAL.

34

b.      JOHANSSON, under oath, described his occupation as a painter of artistic landscapes and decorative interiors.  He claimed that he never was paid by NATIONAL for his work as an Administrative Manager.

81.      After reviewing Kimco's records regarding NATIONAL and JOHANSSON, I learned the following:

a.      There were no records of any relationship between NATIONAL and Kimco prior to on or about May 22, 2014.  The first record of any contact between the two companies was an entry dated on or about May 22, 2014 (*i.e.*, roughly two weeks after the explosion).  On or about that date, Kimco sent an email to operations@natdsi.com addressed to "Carl" with the subject line "Thank you for interest in Kimco. Please start your application today."  The email had a username (Johanson_Carl_652215KA) and password in it for JOHANSSON to complete his application.

b.      Kimco's records show that JOHANSSON interviewed with Kimco on or about May 22, 2014, and listed no previous employment other than having been self-employed for the previous month.  On or about June 2, 2014, Kimco sent JOHANSSON an email that stated, "Greetings and Welcome to the Kimco Team!"  On or about June 2, 2014, JOHANSSON signed numerous Kimco employment forms.

c.      Beginning on or about June 11, 2014, Kimco started sending invoices to NATIONAL for "Carl Johanson, Outside Sales Rep" for approximately $1,467.60 per 40-hour week.  Beginning on or about June 17, 2014, NATIONAL began sending checks to Kimco, in the amount of $1,467.60.

d.      Loretta Surprenant (who, according to the transcript of her interview by Cal OSHA on or about May 30, 2014, had worked for JOHANSSON at NATIONAL for approximately five years and had worked for JOHANSSON's other entities at the PROPERTY for approximately ten years before that) signed off on the time sheets that NATIONAL submitted to Kimco for JOHANSSON's services.

35

e.     A Kimco Accounts Receivable document for NATIONAL showed that Kimco made approximately 17 payments, each in the amount of $1,467.60, to NATIONAL between on or about June 11, 2014 and on or about October 15, 2014. Kimco's activity logs showed 12 entries for "Collection Call" between on or about July 3, 2014 and on or about March 19, 2015 and several references to "NSF CHK." A handwritten note on Kimco's Accounts Receivable document inserted brackets around 12 of Kimco's invoices and stated "17,611.20" and "Write Off" underneath it, causing me to believe that NATIONAL never reimbursed Kimco for JOHANSSON's services from on or about July 27, 2014 to on or about October 15, 2014.[12]

4.     Employees' Confirmation that JOHANSSON Controlled NATIONAL

82.     After reviewing the transcript of GARCIA's interview by Cal OSHA on or about May 29, 2014, I learned that GARCIA said that he was the Shop Manager for NATIONAL. GARCIA said that he had worked at the PROPERTY for approximately fifteen years. He believed that JOHANSSON was "the boss" at NATIONAL when Scott, Jr. was not there. GARCIA also said that he stopped seeing Scott, Jr. at NATIONAL in October 2013 because Scott, Jr. was sick with a brain tumor and that was when "Brad stepped in a bit." GARCIA said that he (GARCIA) delegated the work to the mechanics and tank workers. GARCIA said that for the work that was "handed out" in the shop, he was the person who provided direction and control. GARCIA said that when he was not in the shop, Solis directed the work of the shop personnel.

83.     After reviewing the transcript of SPICER's interview by Cal OSHA on or about May 12, 2014, I learned that he was the Safety Manager at NATIONAL. When he was asked if JOHANSSON was the highest level of corporate management at NATIONAL, SPICER responded, "Oh, yeah. Yeah." When asked about different things JOHANSSON did at NATIONAL, SPICER responded, "He'll do everything. You know, I mean, he's involved with

---

[12] Kimco's documents show that, on or about October 24, 2014, Integrated Management Service, LLC (discussed below) wired a $1,467.60 payment to Kimco.

relations with the customers, he's involved with setting rates, and all that stuff, but he -- and he gives, you know, Henry his marching orders, he kind of keeps things lined up. You know, buys the tires. Like he'll -- well, he controls the money part." SPICER said that the "shop guys" and the truck drivers ultimately answered to JOHANSSON. When SPICER was asked if anyone told JOHANSSON "what to do," SPICER responded, "Oh, God, no. God, no. Well, if you -- unless you want to get fired or sent home." When SPICER was asked who was supervising the shop employees, SPICER responded: "Well, Brad would give them direction, you know, through Henry and Henry would be the person -- you know, the person who made sure everything happened."

84.     After reviewing the transcript of Velasquez's interview by Cal OSHA on or about July 3, 2014, I learned that he said that GARCIA gave him instructions at the PROPERTY. Velasquez said that GARCIA, on multiple occasions, told him that if he did not want to perform certain tasks he would be sent home and GARCIA would find someone else to do the work.

85.     After reviewing the transcript of Martin Gonzalez's interview by Cal OSHA on or about August 21, 2014, I learned that he was the owner of Power Petroleum, a trucking company that pulled NATIONAL's tankers. Gonzalez said that JOHANSSON told him that he (JOHANSSON) was the owner of NATIONAL and Scott, Jr. was "just a salesman." After reviewing Gonzalez's signed statement, dated on or about August 27, 2014, I learned that he stated that JOHANSSON contacted him to direct "each driver's operation."

86.     After reviewing the transcript of Victor Robles's interview by Cal OSHA on or about August 21, 2014, I learned that he was the co-owner of Power Petroleum with Gonzalez and that Robles believed that JOHANSSON owned NATIONAL. When asked how he knew that JOHANSSON was the owner, Robles said that he was not certain regarding the ownership but that he basically "just" dealt with JOHANSSON and that JOHANSSON made the decisions on whether or not to employ him.

37

87.     After reviewing the transcript of the interview of Juver Cuevas ("Cuevas") by Cal OSHA on or about June 30, 2014, I learned that he was a mechanic a NATIONAL and he said that he had seen JOHANSSON give GARCIA directions. When asked if JOHANSSON "ran everything" at the PROPERTY, Cuevas replied, "[Y]eah, I think so."

88.     After reviewing the transcript of the interview of Gabriel Cuevas, Jr. ("Cuevas, Jr.") by Cal OSHA on or about July 31, 2014, I learned that he was a truck washer at NATIONAL and he thought of Scott, Jr. and JOHANSSON as co-owners. Cuevas, Jr. said that JOHANSSON gave directions to GARCIA and then GARCIA gave the directions to the shop employees.

89.     After reviewing the transcript of Max Castaneda's interview by Cal OSHA on or about August 21, 2014, I learned that he was a truck driver who hauled NATIONAL's trucks as a Power Petroleum subcontractor and that he believed that JOHANSSON was the owner of NATIONAL. Castaneda said that while he never talked to JOHANSSON, "everybody knows he's the owner." Castaneda also said, "Brad is the one that bosses everyone around" and that JOHANSSON gave GARCIA directions.

90.     After reviewing a DOT-OIG memorandum, dated on or about August 7, 2017, regarding SA Day's interview of Marcos Garcia on or about July 27, 2017, I learned the following:

        a.      Marcos Garcia's business, called "Reliable Fuel," was acquired by JOHANSSON and NATIONAL around 2008 or 2009. Marcos Garcia worked out of the PROPERTY for about 60 days in 2009.

        b.      JOHANSSON told Marcos Garcia that he was the owner of NATIONAL. JOHANSSON paid Marcos Garcia. Anything related to money went through JOHANSSON.

        c.      JOHANSSON was the "shot caller" at NATIONAL. JOHANSSON directed the maintenance activities at the shop. He "called the shots" when it came to maintenance issues. JOHANSSON told Henry GARCIA what to do. Marcos Garcia stated that

38

Scott, Jr. was not "running the show" at NATIONAL.  Scott, Jr. always "ran things by Brad." Nobody else at NATIONAL was above JOHANSSON.

d.      Marcos Garcia saw welding going on at the NATIONAL shop "every other day."  All of the work to the trucks and tankers was done "in house."  Marcos Garcia was familiar with the work that requires an "R" Stamp and he saw that type of work being done at NATIONAL.  He had an understanding of the steps required to purge a tanker.  He never saw these steps taken while he was at NATIONAL.

### 5.      JOHANSSON's Control and Personal Use of NATIONAL's Bank Accounts

91.      After reviewing Bank of America statements and other account documents for an account ending in 3254, I learned the following:

a.      The account had a "Certified Copy of Limited Liability Company Resolutions" on file, dated on or about December 18, 2013.  Integrated Management Service LLC ("INTEGRATED") was named as the company and "Carl B. Johnson" the "Manager."  An "Authorization for Facsimile Signatures" form filed with this account (and executed on or about December 9, 2013) had the words "Carl Johnson" and "VP" handwritten on the form.[13]

b.      No other names and/or titles were used on these forms.  The bank statements associated with this account were addressed to Integrated Management Service LLC DBA National Distribution Services.

c.      The statements for this account that I reviewed were dated August 2013 through May 2014.  Many deposits were from Chevron, Avfuel, and Tesoro Companies.  There were withdrawals from this account for some expenses that appeared to be business-related.  For example, there were outgoing wires to Oasis Outsourcing, AFS printing, and GITI Tire.

---

[13] As discussed below, JOHANSSON has opened at least one other bank account using the name "Carl Johnson" after presenting to the bank his Arkansas driver's license, which is in the name of "Carl Bradley Johansson."

      d.     The last three months of statements each showed total deposits of over $1,000,000.

      e.     There were transfers to other bank accounts that belonged to NATIONAL.

      f.     There was a check from NATIONAL to "Daniel Lopez" for $707.25. It was dated on or about May 12, 2014 and the check's memo read "April 28, 2014 to May 4, 2014." Velasquez's full name is Daniel Lopez Velasquez.

      g.     There was a check from NATIONAL to "Daniel Lopez" for $690. It was also dated on or about May 12, 2014 and the check's memo read "May 5, 2014 to May 11, 2014."

      h.     There were payments totaling approximately $11,156 from this account to "Lutheran HS Oran DES:FACTS," between on or about February 2014 and May 2014.

    92.    After reviewing an investigative report, dated on or about May 30, 2017, written by SA Day, I learned that SA Day had learned the following through a discussion with IRS-CI Special Agent Kristina Warwick, who also has been working on this investigation:

      a.     JOHANSSON has four children, each of whom attended a private school called Orange Lutheran High School in Orange, California.

      b.     During that period, Orange Lutheran High School used a third-party billing provider for tuition called FACTS.

    93.    After reviewing documents from Orange Lutheran High School, I learned the following:

      a.     JOHANSSON's four children attended the school during overlapping periods between approximately the fall of 2010 and the spring of 2015, and were enrolled with the classes expected to graduate in 2014 and 2016.

      b.     The account used to track their tuition payments was named "william scott."

94.     After reviewing Bank of America statements and signature cards for an account ending in 9309, I learned the following:

   a.     The statements from this account that I reviewed were dated from January 2011 to May 2014.  The statements were addressed to NATIONAL.  The signature card associated with the account listed "WILLIAM B SCOTT JR" as the President and Signer on the account.  "CARL B JOHANSSON" was listed as a signer for the account.  There were no other names or titles associated with the signature card for this account.

   b.     There were many deposits into the account from Chevron.

   c.     Some transactions appeared to be business-related.  For example, there were check card purchases for FedEx, Staples, and AFS Printing.

   d.     There were over 30 payments made from this account to "Lutheran HS Oran DES:FACTS," between on or about January 2011 and May 2014, totaling approximately $121,149.  There were approximately 16 additional payments made to "Facts/Christ Lut Des" totaling approximately $17,309, between on or about January 2011 and May 2012.

95.     After reviewing bank statements and signature cards from an American First National Bank account ending in 0216 for INTEGRATED, I learned the following:

   a.     The account had a signature card associated with it that listed "CARL B JOHANSSON" as the sole signatory on the account.  The bank statements associated with this account were addressed to Integrated Management Service LCC DBA National Distribution Services.  The account was opened in May 2013.  The statements that I reviewed were from June 2013 to August 2015.  Many deposits were characterized as "wire transfer credit."

   b.     Many of the transactions appeared to be business-related.  For example, checks were made out to Cox Communications, AT&T, Aramark Uniform Service, Brandon's Truck Repair, Waste Management, and the United States Treasury.  Many transactions were facilitated via paper check in this account.

41

c.    Seven checks were made payable to "Halstrom" and totaled approximately $8,425.44. Six of the seven checks appeared to be signed with a signature stamp. The signature matched the signature of JOHANSSON's that was used to open the account. After reviewing documents from Orange Lutheran High School, I learned that one of JOHANSSON's children transferred from that school to a school named Halstrom in the Orange County area.

d.    There were six payments made from the account to "Orange Lutheran FACTS" totaling approximately $7,640.

6.    Additional Bank Accounts Evidencing JOHANSSON's Control of NATIONAL

96.    After reviewing Bank of America documents related to an account in the name of INTEGRATED (the documents did not specify an account number), I learned the following:

a.    On or about May 8, 2014, Bank of America mailed a letter addressed to INTEGRATED at P.O. Box 6517[14] in Corona. The letter stated that some of the activity on one of INTEGRATED's accounts may have qualified as a Money Service Business ("MSB") activity. The bank provided a worksheet for INTEGRATED to fill out so that the bank could determine if INTEGRATED was a MSB.

b.    The completed worksheet's customer information section had "Dave Smith / Brad Johnson" hand-printed in the Customer Contact Name field. The Certification section appears to have the signature "B Johnson" on it with "Director" handwritten next to it. It was dated on or about June 2, 2014.

97.    After reviewing Bank of America statements and signature cards for an account ending in 9299, I learned the following:

a.    The statements that I reviewed were dated from January 2011 to April 2014. The account was opened in the name of NATIONAL and had a signature card associated

[14] After reviewing a copy of a P.O. Box application submitted by NATIONAL, I learned that "William Scott," as Vice President of NATIONAL, applied for P.O. Box 6517 in Corona on or about January 26, 2010.

42

with it, which listed "WILLIAM B SCOTT JR" as the President and Secretary on the account. "CARL B JOHANSSON" was listed as a signer for the account. There were no other names or titles associated with the signature card for this account.

      b.    The account had many online transfers into it from the account ending in 9309 (discussed above) and very few deposits.

98.    After reviewing bank statements and signature cards for a Bank of America account ending in 8979 for Integrated Management Service LLC DBA National Distribution Services, I learned the following:

      a.    The statements that I reviewed from this account were dated March 2014 to May 2014. The account had a signature card associated with it, dated on or about April 23, 2014, which listed "Carl Johnson" as the "President/Secretary." The account was opened with an Arkansas driver's license (number -3654). SA Day told me that he verified that this Arkansas license number belonged to JOHANSSON, with a date of birth in September 1958. There were no other names or titles associated with the signature card for this account.

      b.    There appeared to be some business-related transactions associated with the account. For example, there were outgoing wires to SC Fuels, Oasis Outsourcing, and Vanguard Truck Center.

      c.    There were many transfers into the account from Bank of America account ending in 3254 (discussed above). There were transfers from the account into Bank of America accounts ending in 3254 and 9309 (discussed above), and 2266 (discussed below).

      d.    There were wires out to INTEGRATED and NATIONAL.

99.    After reviewing bank statements (from December 2012 through January 2014) and a signature card from a Bank of America account ending in 2266 for NATIONAL, I learned the following:

      a.    The account had a signature card, dated on or about January 31, 2013, associated with it that listed Scott, Jr. as the President and Secretary. JOHANSSON was listed

43

as a signer on the account. There were no other names or titles associated with the signature card for this account.

       b.     The account statements were addressed to "National Distribution Services, Inc., Petty Cash."

     100.    After reviewing bank statements and signature cards from an American First National Bank account ending in 0224 for INTEGRATED, I learned the following:

       a.     The account had a signature card associated with it that listed "CARL BRADLEY JOHANSSON" as the sole signatory on the account. The statements associated with this account were addressed to Integrated Management Service LCC DBA National Distribution Services. The account was opened in May 2013. The statements that I reviewed were from May 2013 to August 2015.

       b.     There were many deposits into the account from Avfuel and Chevron and transfers out of this account and into the American First National Bank account ending in 0216 (discussed above).

       7.    JOHANSSON's Use of NATIONAL's Expense Cards

     101.    Based on my review of an investigative report from SA Day, dated on or about February 28, 2018, I learned the following:

       a.     NATIONAL used a company called Comdata, which provides financial instruments and solutions to companies in the transportation industry. One service that Comdata provides is that it supplies cards, similar to credit and debit cards, for trucking companies to give to their drivers to use for business-related expenses. Comdata provided NATIONAL with more than eighty of these cards.

       b.     NATIONAL assigned specific Comdata cards (with unique card numbers) to many of its employees. Four cards were assigned to "JOHANSSON, CA." Between on or about April 2, 2012 and February 1, 2015 (the date when, as discussed below, WHOLESALE claimed that NATIONAL had left the PROPERTY), the cards assigned to "JOHANSSON, CA"

44

were used to charge roughly $100,000 in goods and services to NATIONAL's account with Comdata.

        c.     Many of the expenses charged on the cards assigned to "JOHANSSON, CA" appeared to be for expenses unrelated to NATIONAL's business. For example, there were charges to The College Board (an SAT-preparation company), "ACT*Programs" (an ACT preparation company), "NCAA ELIGIBILIT" in 2012 and "USA TRACK & FIE" in 2013,[15] and monthly charges to a 24 Hour Fitness in Carlsbad. The largest expense charged to a card assigned to "JOHANSSON, CA" was a charge on or about April 4, 2014, in the amount of $3,260 to "Cal Track Recon," which, based on a Google search, appears to be a track-and-field equipment company based in Fountain View, California.

        d.     NATIONAL continued using the same account at Comdata for employees' expense cards even after WHOLESALE replaced NATIONAL.

        e.     Between on or about February 1, 2015 and June 6, 2017, the cards assigned to "JOHANSSON, CA" were used to charge roughly $65,000 in goods and services to NATIONAL's account with Comdata. Many of these charges appeared to be for expenses unrelated to NATIONAL's (or WHOLESALE's) business. For example, there were several charges to Blinn College in Texas and its bookstore (where, according to a LinkedIn page, a "Bryce Johansson" attended), and additional monthly charges to a 24 Hour Fitness in Carlsbad.

### F.    TankServices LLC and NATIONAL's Lack of Employee Tax Payments

102.    After speaking with IRS-CI SA Kristina Warwick, I learned that IRS regulations require employers to withhold Federal Insurance Contribution Act taxes (also known as "FICA" or Social Security and Medicare taxes), as well as federal income taxes, from the salaries of their employees. Employers are then required to pay to the United States Treasury both the employee's withheld FICA taxes, as well as the employer's portion of such taxes.

---

[15] Based on my review of the Texas A&M website, Carl Johansson from Newport Beach, California, who attended Orange Lutheran High School, was a member of the university's 2014-2015 and 2015-2016 Track and Field rosters.

103.    After reviewing the transcript of the interview of Patricia Medina ("Medina") by Cal OSHA on or about May 9, 2014, and discussing the matter with SA Day, I learned the following:

a.    TankServices was the company that issued the paychecks for NATIONAL's shop employees for a few years prior to the May 2014 explosion.

b.    TankServices did not direct the work of, nor control, any shop employee at NATIONAL.

c.    Medina, who handled administrative work as a NATIONAL employee, owned TankServices along with her husband.  Medina said that JOHANSSON approached her sometime in 2013 and asked her if she could pay NATIONAL's shop employees through TankServices.[16]  JOHANSSON told Medina that NATIONAL would wire her the funds from its bank account.  Needing the extra money, Medina agreed.  NATIONAL paid Medina approximately $115 per week extra to issue checks to the NATIONAL shop employees through TankServices.

d.    TankServices did not pay or withhold any state or federal taxes on behalf of NATIONAL's shop employees.  When a NATIONAL employee asked Medina for a W-2, she directed him to NATIONAL because she believed that the shop employees worked for NATIONAL, not TankServices.

e.    Medina thought that NATIONAL was handling the tax withholdings for the shop employees to whom TankServices was issuing paychecks.

f.    TankServices did not carry worker's compensation insurance for any of NATIONAL's shop employees.  When JOHANSSON approached Medina with the plan for

---

[16] Other witnesses gave contrary statements.  For example, based on my review of the transcript of the interview of Loretta Surprenant by Cal OSHA on or about May 30, 2014, I know that Surprenant (NATIONAL's Office Manager) claimed that Medina's husband approached JOHANSSON with the idea that TankServices should administer the paychecks for NATIONAL's shop employees.

46

TankServices to issue the paychecks, JOHANSSON told Medina that NATIONAL would obtain a worker's compensation policy for the shop employees.

    g.  At Medina's insistence, TankServices stopped issuing paychecks to NATIONAL's shop employees after the May 6, 2014 explosion.

  104.  After reviewing the transcript of the interview of Loretta Surprenant ("Surprenant") by Cal OSHA on or about May 30, 2014, as well as documents from Oasis Outsourcing, I learned that NATIONAL used Oasis Outsourcing (a payroll company) to issue paychecks to NATIONAL's administrative employees and drivers (as opposed to NATIONAL's shop employees, who, with some exceptions, tended to be paid through TankServices).

  105.  After reviewing the Chase bank account records for TankServices (account - 8133), I learned the following:

    a.  "Patricia N Medina" was the sole signatory on the account.

    b.  NATIONAL shop employees were paid from this account from November 2011 to May 2014.[17]

  106.  After reviewing the transcript of an interview of Velasquez by Cal OSHA on or about July 3, 2014, I learned the following:

    a.  Velasquez said that he began receiving paychecks from TankServices, rather than NATIONAL, approximately a year and a half before May 2014. After the explosion, NATIONAL resumed paying Velasquez directly.

    b.  Velasquez said that, during the time period when he was receiving paychecks from TankServices rather than NATIONAL, his supervisor remained GARCIA at

---

[17] After reviewing records from Oasis Outsourcing, I learned that some of NATIONAL's shop employees also were paid by NATIONAL (via Oasis Outsourcing) intermittently during the same time period. For example, the documents show that Enciso received some payments from Oasis Outsourcing in 2013. At present, it is not clear to me why the records show that Enciso was paid by both Oasis Outsourcing and TankServices in 2013. Based on my review of a document from Oasis Outsourcing entitled, "Separation Form," I know that it states that Enciso was "[r]eleased back to National Distribution payroll 1/14/14."

NATIONAL.  The only change in his job was that his paychecks came from TankServices rather than NATIONAL.

107.    After reviewing an IRS investigative report concerning JOHANSSON, and discussing the matter with IRS-CI SA Warwick, I learned the following:

a.    TankServices issued approximately $900,000 in paychecks for NATIONAL employees between 2011 and 2014.

b.    During the same time period, NATIONAL wired approximately $375,000 into TankServices' account, and NATIONAL made approximately $485,000 in deposits into TankServices' account.

c.    During the same time period, neither NATIONAL nor TankServices made any tax withholdings for any of TankServices' payments to NATIONAL's employees.

d.    During the same time period, neither NATIONAL nor TankServices issued any W-2s or 1099s to any of the NATIONAL employees to whom TankServices issued paychecks.

e.    During the same time period, the NATIONAL employees to whom TankServices issued paychecks did not fill out any W-4s.

f.    Bank records for NATIONAL showed deposits of approximately $19.7 million in 2013 and $3.1 million for the first four months of 2014.  NATIONAL did not file tax returns with the IRS for 2013 or 2014.

**G.    NATIONAL's Claim That It Left the PROPERTY**

108.    After reviewing the transcript of the interview of Surprenant by Cal OSHA on or about May 30, 2014, I learned she was the Office Manager for several of JOHANSSON's businesses at the PROPERTY, including NATIONAL, over the previous 15 years.

109.    Based on my review of a letter written to the County of Riverside from WHOLESALE, signed by Surprenant and dated on or about April 22, 2015, I know the following:

48

a.      Surprenant wrote the letter to respond to an invoice from the County of Riverside's Department of Environmental Health to NATIONAL for $1,883 for an Environmental Health Permit.

b.      Surprenant wrote to the County of Riverside, "Per our telephone conversation of earlier today – enclosed is the invoice for National Distribution Services, Inc. National Distribution Services, Inc. closed effective February 1, 2015 and left the premises. Wholesale Distribution Services took over the facility effective February 1, 2015."

### H.      JOHANSSON's Control of WHOLESALE

#### 1.      WHOLESALE's Corporate Structure

110.    After reviewing documents from the Nevada Secretary of State, I learned that WHOLESALE was formed in the State of Nevada on or about December 18, 2014.

111.    After reviewing documents from the California Secretary of State, I learned that John Corsini ("Corsini") was listed as the Chief Executive Officer, Secretary, and Chief Financial Officer of WHOLESALE on a California Secretary of State business filing document, dated on or about September 29, 2015.

112.    After reviewing SA Day's investigative reports, dated on or about March 10, 2017, June 1, 2017, and June 14, 2017, I learned that SA Day learned the following regarding Corsini based on SA Day's discussions with City of Corona Fire Inspector Diedre Locati on or about March 10, 2017, June 1, 2017, and June 13, 2017:

a.      After WHOLESALE submitted a change of ownership form for the PROPERTY in late 2015, Fire Inspector Locati learned that Corsini was the alleged president of WHOLESALE.  Locati demanded a meeting SPICER and Corsini.  In January or February 2016, SPICER picked up Corsini from his home in Glendora and brought Corsini to a meeting with Locati.  SPICER told Locati that Corsini, who was in his 80s, did not drive.

b.      According to Locati, Corsini seemed "kind of clueless" about recent safety violations for which she had cited WHOLESALE.  According to Locati, "Corsini did not seem to

49

understand that Spicer had listed Corsini as the owner of the business" and "it appeared that Spicer 'schooled' Corsini about why they had to meet Locati so he could talk intelligently about the business." According to Locati, the change of ownership form appeared to have been completed "in haste." Based on her 33 years of training and experience in the fire service, Locati believed that "Corsini is involved in the company in name only."

        c.    Locati believed that JOHANSSON was running WHOLESALE and that SPICER was the "face of the company." Locati believed this because JOHANSSON was the one who responded to the scene of an accident involving a WHOLESALE tanker in December 2015 (described below).

113.    Most of the documents that I have seen showing WHOLESALE's address list it as P.O. Box 6455, Norco, CA 92860. From reviewing SA Day's investigative report, dated on or about February 16, 2017, I learned that, on or about that same date, SA Day requested and saw the United States Postal Service P.O. Box account opening documents associated with P.O. Box 6455, Norco, CA 92860. SA Day learned that the account opening forms, dated on or about January 3, 2005, listed "C. Brad Johanson, President, Van Dyke, Inc." as the name of the person applying for the P.O. Box. "Systems, Inc." also was listed on the forms as a name receiving mail at this P.O. Box.

        2.    The Tanker Fire

114.    After reviewing a report from the County of Riverside's Department of Environmental Health – Hazardous Materials Management Branch, dated on or about December 8, 2015 and written by First Responder Mike Walling, I learned the following:

        a.    On or about December 1, 2015, Walling, a Hazmat Responder with the County of Riverside, responded to an accident involving a tanker that was on fire on the I-15 freeway in Lake Elsinore. A man who identified himself as "Carl Johnson" told Walling on the scene that he owned the tanker. "Johnson" said the tanker belonged to Quality Services

Wholesale Distribution, and that he would transport contaminated materials from the accident to the PROPERTY.

        b.    A "Non-Hazardous Waste Manifest" form, attached to the County of Riverside report and dated on or about December 1, 2015, had the hand-printed name "Brad Johansson" on it and a corresponding signature. The "Generator's Name" was filled out as WHOLESALE.

        115.    From reviewing the aforementioned County of Riverside report as well as an investigative report, dated on or about February 27, 2017, written by SA Day, I learned that, while speaking with Walling on or about February 14, 2017, SA Day emailed him an Arkansas driver's license picture of JOHANSSON and asked if this was the person who claimed he was the owner of WHOLESALE at the scene of the accident. Walling told SA Day that is looked like the same person, but that it had been several years since the incident.

        3.    <u>Inspections and Surveillance in 2017 and 2018</u>

        116.    From reviewing SA Day's investigative reports, dated on or about February 2, 2017 and February 10, 2017, I learned that, during SA Day's surveillance at the PROPERTY in January and February 2017, he saw that:

        a.    Several trucks were seen driving in and out of the PROPERTY with "Quality Services" and "Operated by W.D.I." on them.

        b.    Vehicles registered to individuals with the last names SPICER, GARCIA, Solis, Surprenant, Medina, and Reyes were seen either entering or exiting the PROPERTY. The addresses corresponding to the registered owners of these vehicles matched the addresses that those individuals gave during their interviews with the Cal OSHA investigator when NATIONAL was conducting business at the PROPERTY.

        117.    From reviewing SA Day's investigative report, dated on or about March 10, 2017, I learned that, on or about March 10, 2017, SA Day spoke with a City of Corona Fire Inspector Locati, who told him that when she visited the PROPERTY in May 2016, it appeared to the

51

inspector that WHOLESALE was actively conducting business. The inspector saw documents, desks, filing cabinets, and at least two computers. The inspector asked SPICER what was in the (unpermitted) upstairs office and SPICER responded that it used to be an office but it was now used as records storage.

118.    From reviewing SA Day's investigative report, dated on or about March 15, 2017, I learned that, on or about March 14, 2017, SA Day conducted surveillance of the PROPERTY and saw a variety of activities, including a FedEx truck, UPS truck, and several cars pulling in and out of the PROPERTY; tractor-trailers driving around the PROPERTY; a cargo tanker pulling out of the PROPERTY; and seven cargo tankers parked on the PROPERTY. Several of the cargo tankers were associated with Newport Beach P.O. Box 8093.[18]

119.    From my own surveillance of the PROPERTY on or about January 3, January 22, and January 25, 2018, I learned the following:

a.    On each date, from what I could see from outside the PROPERTY, the PROPERTY appeared to be being used in its traditional capacity as a service yard for tankers. On each date, I saw a sign written on the entrance gate that stated "Quality Services." On each date, I saw tankers and passenger cars parked inside the PROPERTY. On each date, I saw security cameras on the exterior of the PROPERTY's building as well as on the front gate.

b.    During my surveillance on or about January 3, 2018, I saw three tankers at the PROPERTY that are listed on the Emergency Order (license plates 4DF3197, 4LP1539, and 4LW6989). While each of these three tankers had a different registered owner, the mailing address for each of the three registered owners was the same:  P.O. Box 8093 in Newport Beach.

---

[18] As set forth above, Kimberly Ord, JOHANSSON's former and/or current wife, opened this P.O. Box in 2002.

c.      During my surveillance on or about January 25, 2018, I saw three tankers at the PROPERTY.[19]

4.      Banking Records Showing JOHANSSON's Control of WHOLESALE

120.   From reviewing an investigative report by SA Day, dated on or about February 21, 2017, I learned that, on or about February 15, 2017, SA Day spoke with Jeremy Carter, a bank examiner with TAB Bank responsible for auditing various aspects of Agri-Comm Express. SA Day learned the following:

a.      Carter noticed several account transfers from Agri-Comm's bank account to WHOLESALE.

b.      Carter said that he talked to JOHANSSON on the phone, on or about October 14, 2016, to clarify who owned WHOLESALE.  JOHANSSON told Carter that JOHANSSON owned WHOLESALE.

c.      Carter's 2016 audit report concluded that JOHANSSON was also the owner of Agri-Comm Express.[20]

121.   After reviewing Bank of America account documents for a WHOLESALE account ending in 8313, I learned the following:

a.      There was a signature card for the account and "GIOVANNI JOSEPH CORSINI" was the sole signatory.  His title was listed as "President."

---

[19] One of the tankers was listed in the Emergency Order (license plate # 4AE9593), but displayed hazmat placard # 1863 (typically for jet fuel), which would not be a violation of the Emergency Order.

[20] After reviewing the transcript of the interview of John Mello ("Mello") by Cal OSHA on or about November 14, 2014, I learned that Mello was the President of Agri-Comm Express, an agricultural products transportation company.  According to Mello, Agri-Comm Express was purchased by Tech Logistics in 2003.  Mello characterized JOHANSSON as the "person on top" of Tech Logistics.  Mello said that he thought JOHANSSON's title was "director or something." According to Mello, Agri-Comm Express was mainly run out of Northern California, but some of Agri-Comm's trucks came through the PROPERTY for maintenance.

b.    In 2015 and 2016, there were approximately 234 wires out of WHOLESALE's account into an account for INTEGRATED at American First National Bank controlled by JOHANSSON. These wires totaled over $1 million.

c.    In 2015 and 2016, there were approximately 178 wires out of WHOLESALE's account into an account for INTEGRATED at Citibank. These wires also totaled over $1 million.

122.    After reviewing Citibank documents associated with the Bank of America transfers (Citibank accounts -1590 and -1608), I learned that "CARL JOHANSSON" was the sole signatory on the Citibank accounts.

5.    Richgel's Milk Service

123.    Based on my review of an investigative report written by SA Day, dated on or about October 13, 2017, I learned the following:

a.    According to Robert Patton, a Money Laundering investigator at Bank of America, JOHANSSON is the sole signatory on a Bank of America account in the name of Richgel's Milk Service ("Richgel's"), a trucking company purportedly based in Highland, Wisconsin. Bank of America has been investigating "highly unusual" suspicious transfers between Richgel's and WHOLESALE since approximately September 2016.

b.    According to Patton, between approximately September 2016 and October 2017, approximately $1 million was wired from WHOLESALE's Bank of America account into Richgel's Bank of America account. During that same period, approximately $292,000 in cash was deposited into Richgel's account. During that same period, there were no check deposits made into Richgel's account.

c.    According to Patton, many checks written from the Richgel's account were in amounts between $2,000 and $5,000. Some of these checks were payable to Phili Davis and Franciso Tamalo.

54

124.    According to a spreadsheet from Oasis Outsourcing's file for NATIONAL, Pili Davis and Francisco Tamallo were NATIONAL employees as of 2014.  According to the spreadsheet, the hire date for Davis was on or about July 24, 2006, and the hire date for Tamallo was on or about April 16, 2009.

## I.    SPICER's Sworn Statement in October 2016 That WHOLESALE Was Not a Reincarnation of NATIONAL

125.    After reviewing a FMCSA Form MCSA-1 for WHOLESALE, I learned the following:

a.    The Form MCSA-1 is an application that businesses use in order to register with FMCSA.  WHOLESALE filed a Form MCSA-1 on or about October 17, 2016 and SPICER signed it electronically.

b.    The principal place of business on the application was listed as the PROPERTY.  The mailing address listed in the form was P.O. Box 6455, Norco, CA 92860.

c.    In the "COMPANY CONTACT PERSON" section, "John Corsini, Sr." was listed as the president and the address given was the PROPERTY.

d.    The "APPLICANT'S REPRESENTATIVE" field listed SPICER.

e.    The "AFFILIATION WITH FMCSA LICENSED ENTITIES OR OTHER APPLICANTS APPLYING FOR USDOT NUMBER REGISTRATION" field of the MCSA-1 form asked: "Do you currently have, or have you had within the last 3 years of the date of filing this application, relationships involving common stock, common ownership, common management, common control or familial relationships with any FMCSA-regulated entities?"  This box was checked "No."  In the "APPLICANT'S OATH" field, SPICER's name was printed and electronically signed.  It was dated on or about October 17, 2016.  The applicant in this field was verifying that "all information supplied on this form or relating to this application is true and correct."

55

126.    After reviewing the transcript of SPICER's interview with Cal OSHA on or about May 12, 2014, I learned that SPICER said that he had worked for System Logistics, TPG, and NATIONAL.  After reviewing City of Corona documents, I learned that JOHANSSON managed all three of these entities at the PROPERTY.

127.    After reviewing the documents described below relating to businesses that JOHANSSON ran at the PROPERTY over the past two decades, I learned the following:

a.    A document entitled "Unified Program Consolidated Form – Facility Information – Business Owner/Operator Identification," dated on or about March 15, 2002, listed Systems Logistics' address as the PROPERTY, Systems Logistics' Manager as Loretta Surprenant, and Systems Logistics' Environmental Contact as SPICER.

b.    A document entitled "Hazardous Materials – Business Emergency Plan and Inventory Certification Form," dated on or about April 22, 2003, was signed by SPICER, who listed his position at Systems Logistics as Safety Director and the company's address as the PROPERTY.

c.    A document entitled "Unified Program Consolidated Form – Facility Information – Business Owner/Operator Identification," dated on or about February 8, 2007, listed T.P.G., Inc.'s address as the PROPERTY, T.P.G.'s owner as JOHANSSON, and T.P.G.'s Environmental Contact as SPICER.  The document was signed by SPICER, who listed his title as "Safety Mgr."

d.    A document entitled "Hazardous Materials – Business Emergency Plan and Inventory Certification Form," dated on or about May 15, 2007, was signed by SPICER, who listed his position at T.P.G. as Shop Manager, T.P.G.'s address as the PROPERTY, and T.P.G.'s owner as JOHANSSON.

e.    A document entitled "Unified Program Consolidated Form – Facility Information – Business Owner/Operator Identification," dated on or about February 2, 2010, listed NATIONAL's address as the PROPERTY, NATIONAL's owner as "William Scott,"

NATIONAL's Environmental Contact as SPICER, and the "Name of Document Preparer" as SPICER.

        f.      A document entitled, "Facility:  National Distribution Services (CERSID: 10461040)," from the California Environmental Reporting System, dated on or about November 19, 2013, listed NATIONAL's address as the PROPERTY, NATIONAL's Primary Emergency Contact and Environmental Contact as SPICER, and NATIONAL's Secondary Emergency Contact at JOHANSSON.

        g.      A document entitled, "Business Owner/Operator Identification," which has a footer indicating that it was printed from the website of the California Environmental Reporting System on or about June 1, 2017, states that it was "Created By: Cameron Spicer on 12/7/2015 9:08 AM." The document listed the site address for WHOLESALE as the PROPERTY, WHOLESALE's Primary Emergency Contact and Billing Contact and Environmental Contact as SPICER, and WHOLESALE's owner as Corsini.

        h.      A document entitled, "Business Owner/Operator Identification," which has a footer indicating that it was printed from the website of the California Environmental Reporting System on or about June 1, 2017, states that it was "Created By: Cameron Spicer on 6/15/2016 2:35 PM." The document listed the site address for WHOLESALE as the PROPERTY, WHOLESALE's Primary Emergency Contact and Billing Contact and Environmental Contact as SPICER, and WHOLESALE's owner as Corsini.

## VI.   TRAINING AND EXPERIENCE RE TRUCKING COMPANIES

128.    Based on my training and experience, and my discussions with SA Day and other USDOT colleagues, I know the following:

        a.      Trucking companies and their executives commonly use digital devices to communicate with suppliers, buyers, regulators, employees, and contractors.  Trucking companies and their executives and employees often rely on email and text messages for communications.  Trucking companies often submit documents to the government electronically

(for example, WHOLESALE submitted its October 2016 FMCSA Form MCSA-1 electronically).

       b.     It also is a common practice for trucking companies to maintain business records on digital devices. Bills of lading, invoices, payroll records, maintenance and safety records, and similar documents often are stored in a business's digital devices.

       c.     When a trucking company does not store its communications and business-related documents in digital devices, the company often stores hard copies of such documents at its principal place of business.

       d.     Documents relating to a trucking company's operations, including manifests, freight bills, cargo reports, and bills of lading, also are typically stored in the cab of the tractor-trailer that is hauling a tanker. This is the case even when the tractor-trailer is owned by one company, and the tanker it is hauling is owned by a separate company, a situation that is not uncommon in the industry. Companies that transport hazardous materials in tankers often are required by statute to keep certain records relating to the materials being transported (such as a bill of lading) in the tractor-trailer hauling the tanker.

       e.     Trucking companies often store their business records and communications at their principal place of business for long periods of time, in excess of five years. This is particularly the case where the operator of a trucking company, such as JOHANSSON, has operated several trucking businesses out of the same principal place of business (the PROPERTY) for decades. Although the corporate identities of the operator's trucking companies may change, it is not unusual for the records of the predecessor entities to remain at the same site for five or more years.

       f.     The same holds true for reincarnated carriers. The records of a reincarnated carrier's predecessor entity often are stored in the same place as the reincarnated carrier's records are stored. Reincarnated carriers often employ the same administrative staff as were employed by their predecessor entities, and they often store records in the same manner

58

(even in the same computers).  Whether they are stored in digital devices or in paper documents, NATIONAL's records likely are stored in the same locations as WHOLESALE's records.

## VII.   <u>TRAINING AND EXPERIENCE RE TAX CRIMES</u>

129.   Based on my discussions with IRS-CI SA Warwick, I know the following:

a.   Individuals retain records relevant to their income and expenses for long periods of time and in places that are private and secure to which they have ready access, such as in their homes, vehicles, and offices and on their digital devices, including their computers, electronic storage devices, mobile phones, and personal digital assistants.  These records may be in the form of written paper documents, notes, written or electronic correspondence, receipts, negotiable instruments, bank statements, bank deposits, daily and monthly journals, ledgers, profit and loss statements, contracts, vendor invoices, leases and rental agreements, and other records.  Such records may include computer-generated correspondence, electronic files, spreadsheets, and transaction logs.

b.   Individuals who are engaged in tax crimes will often maintain two sets of records books, one record of their true income and expenditures and one false record to reflect income and expenditure amounts reported to the IRS.  Individuals often maintain such dual record books in places that are private and secure to which they have ready access, such as in their homes, vehicles, and offices and on their digital devices, including their computers, electronic storage devices, mobile phones, and personal digital assistants.

130.   Based on my training and experience, and my discussions with SAs Day and Warwick, I believe that there is probable cause to believe that evidence of tax evasion by JOHANSSON and NATIONAL will be found at the PROPERTY (their only known principal place of business), including employment records, tax records (both paper and electronically filed versions), tax forms, schedules and attachments, including but not limited to forms W-2 and other worksheets, and supporting documentation used in the creation and or preparation of tax returns.

59

## VIII.   TRAINING AND EXPERIENCE RE DIGITAL DEVICES

131.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.      Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled

60

environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.      Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[21] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, *i.e.*, space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as

---

[21] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

    e.  Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

62

f.      Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

63

132.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

133.    The seizure of digital devices at the PRIOPERTY may have the unintended effect of limiting the conduct of business.  As with any search warrant, I expect that the agents and other officials executing this warrant will execute the warrant reasonably and will avoid causing unnecessary inconvenience to those at the PROPERTY.  Typically, these steps include an incremental approach that might proceed as follows:

a.    Upon arriving at the subject premises, the agents would attempt to identify a system administrator of the network (or other knowledgeable employee) who would be willing to assist law enforcement by identifying, copying, and printing out paper and electronic copies of the things described in the warrant.  The assistance of such an employee might allow agents to place less of a burden on the business than would otherwise be necessary.

b.    If the employees choose not to assist the agents, the agents decide that none are trustworthy, or for some other reason the agents cannot execute the warrant successfully without themselves examining the business's computers, the agents would attempt to locate the things described in the warrant, and would attempt to make electronic copies of those things.  This analysis would focus on things that may contain the evidence and information of the violations under investigation.  In doing this, the agents might be able to copy only those things that are evidence of the offenses described herein, and provide only those things to the case agent.  Circumstances might also require the agents to attempt to create an electronic "image" of those parts of the computer that are likely to store the things described in the warrant.  The agents or qualified computer experts would then conduct an off-site search for the things described in the warrant from the "mirror image" copy at a later date.  If the agents successfully image the computers, the agents would not conduct any additional search or seizure of the computers.

64

c.      If imaging proves impractical, or even impossible for technical reasons, then the agents would seize those components of the business's computer system that the agents believe must be seized to permit the agents to locate the things described in the warrant at an off-site location.  The seized components would be removed from the subject premises.  If employees of the business so request, the agents would, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of any legitimate business, if any, by the company.  If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government would return it within a reasonable time.

## IX.   CONCLUSION

134.    For all of the reasons described above, there is probable cause to believe that JOHANSSON and GARCIA violated 49 U.S.C. § 5124, 49 C.F.R. § 180.413(a)(1), and 18 U.S.C. § 2(b),  and that SPICER violated 18 U.S.C. § 1001.  There also is probable cause to believe that the items described in Attachment B will be found at the locations described in Attachment A.


_____
RASMUS JAMES, Special Agent
U.S. Department of Transportation, Office of
Inspector General


Subscribed to and sworn before me
this 5ᵗ day of April 2018

_____
HONORABLE SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE


65

# EXHIBIT 1

CA-2014-9002-EMRG
Appendix A

| Unit number | Serial number | License number |
|---|---|---|
| 5A | 19308 | 4LW6989 |
| 17 | 3293 | 8L28553 |
| 17A | TT31299-07 | 4JK1064 |
| 19A | 85T006902 | 4FU7543 |
| 21A | 5HTAB4427TH60745 | 4MP5575 |
| 22 | 1NP5LU9X120573269 | 8F92489 |
| 22A | 1PMA2322321024977 | 4HH9199 |
| 23A | H60748 | 4GX6514 |
| 25 | 21-24974 | 8F78952 |
| 25A | 21-24979 | 4LA3440 |
| 28 | 21-24973 | 8F81338 |
| 28A | 21-24978 | 4HG9973 |
| 29 | BT32617-08 | 8N87678 |
| 29A | TT-32618 | 4JP2282 |
| 30 | BT-32533-08 | 8X55821 |
| 30A | TT32534-08 | 4JP2281 |
| 2302 | T1081 | 8R79690 |
| 41002 | 1T9AE5B0JF003169 | 4AS5324 |
| 41443 | 4FL015006 | 8R9689 |
| 41448 | STL405691 | 4LE3408 |
| 41450 | 3293 | 4KJ8566 |
| 41823 | E1-6682 | 4KE5208 |
| 42070 | 7H59245 | 4LP1539 |
| 42555 | 1C9RT2222EC129110 | 4HXZ4147 |
| 43121 | 1C9RT222XJS125323 | 4LA413 |
| 43224 | 1BN2T3922GP177780 | 4ME3137 |
| 43230 | ST18473 | 4AE9593 |
| 44098 | 1C9RS4225GS125172 | 4DF3174 |
| 44178 | 1H4T04227CL009301 | 4FU9764 |
| 44338 | 1PM24427K1010017 | 4DF2837 |
| 44360 | FRV-771006 | 4HX4148 |
| 44774 | OMX739606 | |
| 45130 | 1Y9T1AT23G2002152 | 4DF2840 |
| 51006 | STI20779 | 4EH2161 |
| 51012 | ST26204A | 4KL5951 |

**CA-2014-9002-EMRG**
**Appendix B**

| Unit number | Serial number | License number |
|---|---|---|
| 41143 | T18951 | 8R79689 |
| 42232 | TT18951 | 4B1662 |
| 43086 | 4CL009301 | 4DF3197 |
| 43121 | 1C9RT222XJS125323 | 4LA3413 |
| 43224 | ST17778 | 4ME3137 |
| 44098 | 1C9RS4225GS125172 | 4DF3174 |
| 44360 | FRV771006 | 4HX4148 |